Argued October 3, affirmed October 23, 1928.

RALPH B. MOORE *v.* WILLAMETTE IRON & STEEL WORKS.

(271 Pac. 49.)

For appellant there was a brief over the names of *Mr. W. Elmer Ramsey* and *Messrs. Butler & Jack,* with oral arguments by *Mr. Ramsey* and *Mr. Glenn R. Jack.*

For respondent there was a brief over the names of *Mr. Charles A. Hart* and *Messrs. Carey & Kerr,* with an oral argument by *Mr. Hart.*

BROWN, J.—In September, 1925, negotiations were carried on by the plaintiff and defendant, which resulted in the employment of plaintiff by defendant as salesman for a certain lumber carrier designed by the plaintiff, and in the granting to the defendant by plaintiff of an exclusive license to manufacture and sell the same. The agreement, designated herein as Exhibit "A," was reduced to writing. It reads:

"September 18, 1925.

"Mr. Ralph B. Moore.

"Dear Sir:

"We are desirous of developing the manufacture and sale of the lumber carrier designed by you and for which we understand you have heretofore made application for a patent or patents, and with that end in view we make the following proposal:

"We will employ you for the term of one year from this date to sell the above-mentioned lumber carrier. You will devote all of your time and attention to the sale of these carriers, subject to the direction of the officers and board of directors of this company. You will also render such assistance as you may be able to give in connection with designing or improving the design of the carrier.

"Prices, terms of sale, and all matters of that character are to be determined solely by us.

"We will pay for your services during the term of this agreement the sum of $250 per month, and, in addition, will pay to you the sum of $100 for each lumber carrier sold and delivered during said period of one year.

"If a patent or patents are issued at any time during the term of this contract covering the above-mentioned carrier or any improvements thereof, you are to give to us an exclusive license to manufacture and sell such carrier during the entire life of the patents. The above-mentioned compensation of $250 per month and the additional commission of $100 for each lumber carrier sold during the period of this agreement shall be in lieu of royalties for the right to manufacture and sell such carrier during the term of this agreement. In the event that you shall for any reason not be employed by us after the term of this agreement, we will pay to you a fair royalty for such license to manufacture and sell; the amount of such royalty to be agreed upon by us, and in case we cannot agree the amount thereof shall be fixed by the Senior Judge of the United States District Court for the District of Oregon,

acting as sole arbitrator. In no event shall such license exceed the sum of $100 for each carrier manufactured and sold.

"In the event that a patent or patents are issued to you covering this carrier, you are to defend the validity thereof (at) your own cost and expense. If you do not do so, or if you concede or admit the invalidity of such patent or patents, or allow any other person to manufacture or sell a lumber carrier which infringes upon said patent or patents, then and in that event we will be thereafter under no obligation to pay royalties to you for the right to manufacture and sell said carrier.

"We would expect to continue this agreement in effect after the end of the above-mentioned term, if everything turns out satisfactorily to both of us, but of course either party would have the right to not extend the agreement.

"In making this proposal we wish to emphasize the fact that we are desirous of developing the sale of this lumber carrier to the greatest possible extent and trust that you will accept this offer to come with us only in case you are prepared to undertake your duties with energy and enthusiasm.

"If you approve this arrangement, please note your approval on one copy of this letter and return it to us.

"Yours very truly,
"WILLAMETTE IRON & STEEL WORKS,
"(Signed)    E. C. PAPE."

Soon after the execution of this agreement, the John Wood Iron Works served notice upon this defendant that plaintiff had theretofore assigned, or agreed to assign, his patent rights in his Bull-Dog Lumber Carrier to the Wood Company, and that if the defendant undertook to manufacture and sell that lumber carrier, such act would constitute an infringement upon the rights of the John Wood Iron Works. It seems that when plaintiff's attention was

called to the notice, he denied having made the assignment, or an agreement to assign. The Wood Company, however, demonstrated the truthfulness of its assertion by producing an agreement that had been duly executed by this plaintiff, whereby he agreed to assign his rights in his invention to the John Wood Iron Works. This defendant then attempted to purchase from the Wood Company all the rights it had acquired from the plaintiff, and negotiations were had between that company and defendant for the purchase of the drawings, patterns and uncompleted machines, together with plaintiff's alleged assignment. The purchase price named by the Wood Company was $7,500, while the appraised value, as calculated by the defendant, was $4,800. The plaintiff was greatly interested in the acquisition by defendant of the drawings, patterns and uncompleted machinery in the possession of the Wood Company, together with his agreement for assignment, and, in order to effect the purchase from the Wood Company of this personal property and the rights to manufacture the Bull-Dog Lumber Carrier, he agreed with defendant that if it would pay the Wood Company the full sum of $7,500, he would waive the commission of $100 which would be due him upon each of the first 27 machines to be manufactured and sold. Pursuant thereto, this defendant paid to the John Wood Iron Works and Mary C. Wood the sum of $7,500 and received therefor their release, herein designated as Exhibit "B," and covering the following:

"All drawings and patterns whatsoever now held or owned by the said John Wood Iron Works and the said Mary C. Wood, or used in connection with the development or manufacture of a certain lumber carrier heretofore manufactured by John Wood Iron

Works, and known as the 'Bull-Dog Lumber Carrier'; also all inventory of materials, supplies, parts, either in an unworked or finished or partly finished state, owned or used for the manufacture of such Bull-Dog carrier; also special tools * * . The said John Wood Iron Works and the said Mary C. Wood * * do also assign, transfer and set over unto said Willamette Iron & Steel Works all patent rights in connection with the manufacture of said Bull-Dog carrier, and all rights whatsoever to apply for or secure a patent * * . And the said John Wood Iron Works and Mary C. Wood do hereby release, acquit and discharge Willamette Iron & Steel Works of and from any and all claims and demands whatsoever now owned by them, or either of them, or arising or to arise out of the manufacture and sale by the said Willamette Iron & Steel Works of the said Bull-Dog carrier.''

On the day following the execution of the foregoing release by the Wood Company and Mary C. Wood, the following agreement, herein designated as Exhibit ''C,'' was executed by the parties hereto:

''Memorandum of Agreement, Made October 22, 1925, Between Willamette Iron & Steel Works and Ralph B. Moore.

''In consideration of the unusual and unforeseen expense incurred by Willamette Iron & Steel Works in the development of its lumber carrier, Ralph B. Moore agrees to waive all right to the commission of One Hundred Dollars ($100) provided for in the agreement of September 18, 1925, for the first twenty-seven (27) lumber carriers sold and delivered by Willamette Iron & Steel Works. Except as modified by this agreement, the understanding and agreement of September 18, 1925, shall be and remain in full force and effect.

> ''WILLAMETTE IRON & STEEL WORKS,
> ''By (Signed)   E. C. PAPE,
>                     ''Vice-President.
> ''(Signed)   RALPH B. MOORE.   (Seal)''

The excerpt from the above memorandum reading: "In consideration of the unusual and unforeseen expense incurred by Willamette Iron & Steel Works in the development of its lumber carrier," has reference to this plaintiff's misrepresentations in relation to his assignment to the John Wood Iron Works of the right to manufacture the "Bull-Dog Lumber Carrier."

Having acquired the lawful right to manufacture the lumber carrier, this defendant constructed a number of the carriers and the plaintiff undertook to sell the same. Later, a question as to royalty on machines manufactured and sold in Canada arose, and some matters relating to the application for patent coming up, the parties hereto executed two written agreements, the first of which, herein designated as Exhibit "D," is as follows:

"Memorandum of Agreement Made February ——, 1926, Between Willamette Iron & Steel Works, an Oregon Corporation, and Ralph B. Moore, of Portland, Oregon.

"The Willamette Iron & Steel Works, by letter dated September 18, 1925, the terms of which were accepted by said Moore, employed the said Moore for the term of one year to sell a certain lumber carrier known as the 'Willamette Carrier,' which the Willamette Iron & Steel Works at that time proposed to develop, manufacture and sell. The development of said carrier has progressed to such an extent that the parties wish to extend the term of such employment. In consideration of the premises and of the mutual agreements herein contained to be performed by the respective parties, it is agreed as follows:

"1. Willamette Iron & Steel Works hereby employs Ralph B. Moore for the period to and including December 31, 1926, and agrees to pay to the said Moore for his services the sum of $250 per month.

"2. The services to be performed by the said Moore shall consist principally in selling the said carrier, but the said Moore shall render such service as he may be able to give in connection with developing and improving the design of said carrier, and perform such other services as the officers and directors of said Willamette Iron & Steel Works may from time to time prescribe. The said Moore agrees to devote all of his time and attention and his best efforts to the business of the Willamette Iron & Steel Works.

"3. Prices, terms of sale and similar matters connected with the development and sale of said carrier shall be determined solely by Willamette Iron & Steel Works.

"Executed as of the day and year first herein written.

"Willamette Iron & Steel Works,
"By (Signed)   E. C. Pape.
"(Signed)   Ralph B. Moore.   (Seal)"

The second, designated as Exhibit "E," reads:

"Memorandum of Agreement Made February ——, 1926, by and Between Ralph B. Moore, Hereinafter Known as the 'Owner,' and Willamette Iron & Steel Works, an Oregon Corporation, Hereinafter Known as the 'Licensee.'

"Heretofore the Owner designed and developed a certain lumber carrier which for some months past the Licensee has been manufacturing under agreement dated September 18, 1925, between the parties hereto. The Owner heretofore filed or caused to be filed applications for letters patent in the United States and in the Dominion of Canada, covering the patentable features of said lumber carrier. The manufacture and development of said lumber carrier have progressed to the point where its success as a commercial and industrial product seems assured. In consideration of the premises and of the agreements herein contained to be performed by the representative parties, it is agreed as follows:

"1. The Owner gives and grants unto the Licensee the exclusive right and license to manufacture and sell said lumber carrier and all members or parts thereof for which applications for patents have heretofore been made in the United States or in the Dominion of Canada, and any and all improvements in said carrier or in the members or parts thereof which are patentable, or for which applications for letters patent may hereafter be filed, either in the United States, the Dominion of Canada, or any other country. This license shall continue during the entire life of such patents.

"2. The Licensee shall have the right and authority to enter into sublicensing agreements, giving and granting to other persons, firms or corporations the right to manufacture and sell said carrier and the patented parts or members thereof to such extent and in such manner as to the Licensee may seem desirable.

"3. The Licensee agrees to pay a royalty of $100 for each lumber carrier manufactured and sold by it or under its permission or license in the United States, and $50 for each carrier manufactured and sold by it or under its license or permission in the Dominion of Canada, or in any other country except the United States, payment to be made to the Owner on or before the 20th day of each month for all carriers manufactured and sold during the preceding month. * *

"(Signed)  RALPH B. MOORE.  (Seal)
"WILLAMETTE IRON & STEEL WORKS,
"By E. C. PAPE, V. P.  (Signed)."

We have set out almost in their entirety four documents known as Exhibit "A," "C," "D" and "E," and a fifth, Exhibit "B," in substance. These documents clearly show the situation. It appears therefrom that plaintiff entered the employ of the defendant corporation upon a salary and commission basis, and granted to that corporation the right to

manufacture the article which he had invented, and for which an application for patent was pending. These exhibits make the relationship plain. They show why the defendant purchased the personal property from the John Wood Iron Works, and they tell the story of the plaintiff's waiver of his commission and suggest the reason therefor.

■ In view of the foregoing facts, were the plaintiff and defendant engaged in a joint adventure? In *Elliott* v. *Murphy Timber Co.*, 117 Or. 387 (244 Pac. 91, 48 A. L. R. 1043), a joint adventure is defined as an association of two or more persons to carry out a single business enterprise for profit. Although it is held not to be identical with partnership in its nature, yet it is analogous to a partnership, and it is governed by practically the same rules of law: 2 Modern Law of Partnership, Rowley, § 975. At Sections 982 and 983, this author also says that, as a general rule, all the profits arising from a joint adventure belong to all of the parties thereto, and all must share in its risks. For a full note on what amounts to a joint adventure, see annotation in 48 A. L. R., beginning at page 1055. See, also, 17 Ann. Cas. 1022, note on mutual rights and liabilities of parties to a joint adventure; 33 C. J. 839.

A case involving a contract between an inventor and a licensee is *Goodwin* v. *Camp*, 295 Fed. 785. In that case, as here, the plaintiff was paid a salary and a commission, while the defendant did the manufacturing; and the federal court, after defining the term "joint adventure," and declaring that the rights of the parties should be determined "upon the same principles as are applied by courts of equity to partnership transactions," said:

"Under such construction, the idea of 'joint adventure' is here lacking, not because defendant owned the factories and the New York and other offices, and all other tangible assets, and himself paid all expenses of manufacturing and for the most part all other expenses of the business, but because appellant was paid as compensation for her services fixed commissions upon the gross sales, without reference to whether the business made a profit or suffered a loss, and thus whether or not there were any net or joint proceeds to divide."

■ Clearly, the record in the case before us fails to establish the existence of a joint adventure between the parties.

The plaintiff complains that he was denied the right to prove by parol evidence the extension of his employment contract. He alleges that, at the time of the execution of the contract herein designated Exhibit "B," an oral agreement was made between the parties, whereby his contract of employment with the defendant was to be renewed for an additional year under like terms upon its expiration, and that that oral agreement was reiterated many times thereafter.

■ ■ Section 808, Or. L., provides that every "agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged; * * that by its terms is not to be performed within a year from the making thereof." See, also, 2 Page on the Law of Contracts, § 1292, and cases cited under note 1. Nothing is better settled than the rule that parol evidence is not admissible to prove a contract required by the statute of frauds to be in writing. This question was passed upon by our court as early as the case of

*White* v. *Holland,* 17 Or. 3 (3 Pac. 573), where it was held that a lease of land for one year, to commence in future, is an agreement that cannot be performed within the meaning of the statute, and must be in writing. To like effect is the much cited case of *Lockwood* v. *Barnes,* 3 Hill (N. Y.), 128 (38 Am. Dec. 620). In that case it was held that, when by its terms a contract cannot be performed within one year from the time it is made, it is required to be in writing. That case goes further and holds that, although the performance is to begin within the year, part performance within that period will not render the contract valid, and if the agreement is not to be completely executed within that period, the case is within the statute of frauds.

■ The only remaining question relates to the rescission of plaintiff's agreement with defendant for the manufacture of the lumber carriers hereinbefore referred to. The complaint avers that the defendant has failed to account to plaintiff for the commissions that were due under their contract, and that, by reason of this failure, plaintiff has elected to rescind. The evidence shows that there was nothing due the plaintiff on account of his sales of lumber carriers, and the court properly rejected his prayer for rescission upon the ground alleged.

We believe that this cause should be affirmed. It is so ordered.

■ For the reason that neither party hereto is entirely blameless, neither will be permitted to recover costs.                                        AFFIRMED.

RAND, C. J., and BEAN and BELT, JJ., concur.