Argued April 1; affirmed April 28; argued on rehearing September 8; reversed September 15, 1942

ROSS *v.* ROBINSON
(124 P. (2d) 918, 128 P. (2d) 956)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Don R. Newbury*, of Medford, for appellant.

*W. T. Miller*, of Grants Pass (Orval J. Millard, of Grants Pass, on the brief), for respondent.

BAILEY, J. The defendant, Everett E. Robinson, has appealed from a judgment in favor of the plaintiff, Frank P. Ross, administrator of the estate of Lyna M. Ross, deceased, in this action brought by Ross to recover damages for the benefit of the decedent's estate. Mrs. Ross died December 14, 1939, from injuries received by her December 12, 1939, in a collision between her husband's automobile, in which she was riding as a passenger, and an automobile owned and driven by the defendant.

The accident occurred on what is commonly known as the Redwood highway, approximately two miles west of the city of Grants Pass. Frank P. Ross, accompanied

by his wife, Lyna M. Ross, in the front seat of his car, a 1935 Chevrolet sedan, was driving in a westerly direction. According to his testimony, he was driving at a rate of thirty to thirty-five miles an hour, when he overtook C. C. Pritchett, driving a 1926 Studebaker pick-up car in the same direction. Pritchett testified that his car was proceeding at about twenty-five to thirty miles an hour, while Ross's testimony was that the Studebaker was traveling at a speed of twenty to twenty-five miles an hour.

Ross testified that when he was within thirty or forty feet of the Studebaker he looked ahead in the highway and noticed a car approaching at a distance he estimated as about three hundred yards. He turned to the left side of the highway and undertook to pass the Studebaker, and when about opposite the Studebaker his own car collided with the defendant's automobile, a 1939 Buick coupe, which was the car he had seen approaching. The impact occurred at the left edge of the highway, almost off the pavement and on the shoulder of the road. The right front end of the defendant's car struck the right side of the Chevrolet, near the front.

The accident occurred at approximately 4:50 o'clock in the afternoon of December 12. Headlights were not required for visibility and none of the cars had any burning. The roadway is straight and practically level for a distance of half a mile or more in both directions from the place of the collision. The paved part of the highway is nineteen feet in width, and the shoulders along the sides are between eight and nine feet wide.

When Pritchett saw that a collision appeared inevitable, he drove his car far to the right, on the north side of the highway, to leave room for the other two cars to pass.

The acts of negligence charged by the plaintiff against the defendant are the following:

"(a) In wholly failing to keep a lookout for other automobiles then and there on the highway, and

"(b) Traveling at a highly dangerous and excessive rate of speed considering the traffic and surface, condition and width of the highway, and the position of other automobiles on the highway, including the automobile so owned and operated by the plaintiff, Frank P. Ross."

Two of the assignments of error are based on the failure of the court (1) to grant the defendant's motion for an involuntary nonsuit and (2) to grant the defendant's motion for a directed verdict in his favor. The motions were in writing and submitted without argument. The motion for a directed verdict, worded similarly to that for an involuntary nonsuit, was "on the ground and for the reason that there has been no evidence received sufficient to establish or prove the allegations of the complaint and the issues of the case."

■ One of the reasons urged by the defendant in his brief, in support of the above mentioned motions, is that there was no evidence that he "was violating the basic rule of the Oregon statute as to speed". The plaintiff, in order to prove that the defendant was driving at an excessive rate of speed, introduced evidence as to two skid marks, presently to be discussed, which, he asserts, were made by the defendant's Buick. The defendant, on the other hand, argues that there is no evidence that the longer of the two marks was made by his car. He contends, in fact, that the evidence is conclusive that that skid mark was not caused by his car at all. We shall first refer to the testimony of the plaintiff's witnesses concerning the two skid marks.

Jay Williams, a state police officer stationed at Grants Pass, arrived at the scene of the accident at 5:10 p. m. After rendering assistance to those injured, he looked around for skid marks. He found one at the place of the accident which extended about thirty-nine feet westerly, in the direction from which the defendant's car had come, and another mark, about one hundred thirty-six feet long, the east end of which was one hundred and one feet west of the first skid mark. By the time the officer observed the .skid marks it was becoming dark and he had to use a flashlight to see them. That evening, he designated on the pavement the location of the marks; and the next afternoon, about 2:30 o'clock, accompanied by Corporal Lloyd Harrell, another state police officer, he went to the place of the accident, measured the length of the skid marks and made a close observation of them. Concerning the marks he gave the following testimony:

"Q. Now, you say you have had a year or two experience as a traffic officer. Now, what would you say as to the appearance of those two sets of skid marks with reference to time—that is, with reference to the time when they might have been made?

"A. From the freshness of the skid marks and the evidence on the pavement, they were made at the same time.

"Q. Did you examine the skid marks closely—minutely?

"A. Yes, sir.

"Q. What can you say, if anything, with reference to any dust or anything of that kind having accumulated on them?

"A. There was no dust accumulated on them; they were fresh next day. Any one could see they were the burnt marks of the skid on the pavement a skid will make . . . a fresh skid as plainly a few hours afterwards as at the time it was made."

On cross-examination, his testimony was as follows:

"Q. You spoke about freshness of the tire mark. What is there about the freshness of a tire mark that you can say whether it has been there one day or three days or seven days?

"A. You will find on observation of the skid a certain amount of rubber fiber which has been burned off on the highway that makes a fine dust; in a few days it isn't in evidence.

"Q. And you saw this fine dust there the next afternoon, did you?

"A. I don't say I saw fine dust there that afternoon. I said I checked the skid marks that night.

"Q. You saw that with your flashlight, did you?

"A. That is right."

Corporal Harrell, who assisted Officer Williams in making the measurements, had been a member of the Oregon state police force four years. He stated that he had made a study of automobile traffic conditions. In reference to the skid marks he thus testified:

"Q. Now, the skid marks in front of the Smith residence [where the accident occurred], what did they indicate?

"A. There was a skid mark leading from the mail box by the residence west on the pavement for a distance of thirty-nine feet, and one hundred and one feet west of that point was another set of skid marks on the south line of the highway, and we measured them and found them to be one hundred and thirty-six.

\* \* \*

"Q. Now, at the time you examined those skid marks what could you say as to the appearance of the . . . the relative appearances of the two sets of skid marks, that is, the thirty-nine foot skid marks and also the one hundred thirty-nine—one hundred thirty-six foot skid marks?

"A. The set of skid marks which were the one hundred thirty-six foot ones had traveled straight down the

highway for a ways and then swung to the center stripe and then angled away from the center stripe, at which point they stopped. At the point where the thirty-nine foot marks began, they were at the same angle as the other marks; they were of the same intensity, same coloring, and were the same width.

"Q. They—did they appear to you to be the same?

"A. From that, I assumed them to be the same marks."

John Louis Frost, who lived in the immediate vicinity of the place where the accident occurred, testified that he saw the collision and at once went to the two cars, to render what assistance he could. About 6 o'clock that evening, in company with Officer Williams and at least one other individual, he examined both the skid marks to which attention has been called. With reference to what he did, he said: ". . . I took my knife and followed and went along the tracks and in different places scraped up the fresh rubber that was on the pavement, left when he applied the brakes, extending all along the tracks leading down to a place where the skid marks were broken. Apparently the car released the brakes for a short distance and then after a little gap took hold again, and clear up to the Buick car you could scrape up a nice little bunch of fresh rubber, which I did, and called the officer's attention to it."

There was testimony to the effect that the two skid marks were caused by the left wheel or wheels of a car proceeding in an easterly direction, and that parallel with those marks and farther south on the pavement were other marks, less distinct, apparently caused by the right wheels of the same car. The south skid marks showed less clearly because, according to some

of the testimony, the surface where they were made was rougher than that under the left wheel marks.

The testimony was conflicting as to whether the skid marks were on the pavement prior to the day of the accident. One witness, who at the time of the trial was an employee of the defendant, said that he had seen the longer of the two marks from one to three weeks before the collision. Later, however, he qualified that statement by saying that he had not noticed the easterly end of the longer mark prior to the accident. Other witnesses who traveled the highway frequently, some of them daily, testified that the skid marks were not on the pavement in the morning of the day of the accident.

The evidence on which the defendant principally relies to prove that the longer of the two skid marks was not made by his car consists largely of photographic exhibits. On December 17, five days after the collision, the defendant procured a commercial photographer to take photographs of the longer skid mark. A one-foot ruler was laid on the pavement while the pictures were taken, to show the width of the skid mark.

On July 10, 1940, other photographs were taken, of skid marks made on that day by both the left wheels of the defendant's car. The tires then on the two wheels were the same that were on the wheels on the day of the accident. In making the experiment on July 10, "twelve or thirteen attempts" were made before "getting the marks plain enough to be taken by" the camera, according to the photographer who then assisted. The defendant testified in this connection as follows:

"A. We had to go out here on the old highway south of the—south of the fairgrounds. We had to go

over soft pavement to make it show, because it wouldn't show on anything—it won't show on ordinary hard pavement.

"Q. State whether or not when we finally got it, whether the pavement was warm—on a warm day.

"A. A very hot, warm day.

\* \* \*

"Q. And approximately what rate of speed were you driving when you put the brakes on when that mark was taken?

"A. About fifteen."

In making photographs of the experimental skid marks, the same one-foot ruler was placed over the marks and included in the pictures that was used in photographing the original skid mark.

The photographs of the longer skid mark showed the impression of a tire tread approximately three and one-fourth inches wide, with three center ribs and two narrow outside ribs, while the photographs of the experimental skid marks taken July 10, 1940, showed that both the front and rear left tires of the Buick made an impression five inches in width, the left front tire leaving an impression of five center ribs and two heavier outside ribs, and the left tire, a middle area about one and three-quarters inches in width with two ribs on both sides of it, each approximately three-quarters of an inch wide.

The defendant called as a witness J. G. Bromley, a civil engineer employed by the maintenance department of the state highway commission. Mr. Bromley testified that on December 16, four days after the accident, he examined the longer skid mark and had a drawing of it made under his supervision, indicating its length and direction, and in addition a cross-section

showing the actual width and grooves of the tire tread as appearing in the impression.

The evidence of the experiment made by the defendant July 10, 1940, may have been of some assistance to the jury in determining whether the longer skid mark was made by the defendant's coupe. The skid marks photographed July 10, however, were made under entirely different conditions from the marks made December 12, 1939, in different weather, on different pavement and at a different driving speed. According to his own testimony, the defendant, at the time he applied his brakes immediately before the accident, was traveling at the rate of about fifty miles an hour; and at the instant of collision, about fifteen to twenty miles an hour. At the time of the experiment, as above stated, his car was traveling at the rate of about fifteen miles an hour.

In addition to the above testimony of various witnesses, the defendant stated that he had examined the longer skid mark and that it had not been made by his Buick. He testified further that he had applied his brakes about one hundred feet distant from the place of the mishap; that they did not take effect until within thirty-nine feet of that place; and that when driving at the rate of fifty miles an hour he could stop his car within ninety feet after applying the brakes.

The evidence to which we have referred presented a question of fact for the determination of the jury. There was substantial evidence from which the jury could have found that the longer skid mark near the place of the accident was caused by the defendant's Buick immediately preceding the collision. It is not contended by the defendant that, had the jury found

that the longer skid mark was so caused, there would not have been substantial evidence that the defendant was driving at an excessive speed.

■ The other ground urged by the defendant in his brief, in support of his motions for an involuntary nonsuit and a directed verdict, is that the plaintiff failed to prove any pecuniary loss to the estate of the decedent; and that the jury should not be permitted to speculate on the question of damages.

It was stipulated by counsel for the respective parties that Mrs. Ross at the time of her death was forty-eight years of age and that her life expectancy was twenty-three and thirty-six hundredths years. Mr. Ross testified that his wife's weight at the time of her death and for some years prior thereto was one hundred sixty-eight pounds; that she was in good health; and that she did the ordinary work of a housewife. At the time of her death their home was on an eighteen-acre tract of irrigated land outside Grants Pass that was acquired by their joint efforts. There was no evidence as to the value of the land or the amount of incumbrance, if any, against it. No livestock or chickens were kept on the place and there was no garden. Mr. Ross was employed in driving a truck, and "usually took care of the place in the evenings or Sundays or days off". Apparently the decedent and her husband had no children and lived alone on their acreage.

This action was brought under § 8-903, O. C. L. A., by the personal representative of Lyna M. Ross, deceased, for the benefit of her estate. This section provides that the action shall be brought by "the personal representatives of the" deceased "for the benefit of the widow or widower and dependents and

in case there is no widow or widower, or surviving dependents, then for the benefit of the estate of the deceased''. The provision that the action be brought "for the benefit of the widow or widower and dependents'' was added by amendment in 1939 (chapter 466, Oregon Laws 1939). In the instant case the widower of the deceased brought this action as administrator of her estate, not for his benefit but that of the estate. The case was tried in the circuit court on the theory that recovery, if any, would be for the benefit of the estate, and the parties adhered to that theory on this appeal. We shall therefore adopt it and consider whether the evidence is sufficient to warrant submission of the case to the jury on the question of the pecuniary loss suffered by the estate of the deceased.

In support of his contention that the evidence is insufficient to warrant any recovery by the plaintiff, the defendant cites and quotes extensively from decisions of this and other jurisdictions relating to actions brought under statutes providing for recovery for the benefit of the surviving spouse or dependents, and not for the benefit of the estate. The distinction between actions of that nature and the one now before us is pointed out in *Carlson v. Oregon Short Line Ry. Co.*, 21 Or. 450, 459, 28 P. 497, wherein the court said:

"In such case the damages suffered by the estate can have nothing to do with the amount of the recovery, but it is limited to the pecuniary loss sustained by those persons named in the statute, and who are left in a worse pecuniary position by reason of the death. * * * [Citation.] Not so under our statute, where the object is to recover the loss sustained by the estate, and not to recover the pecuniary loss sustained by any particular individual or individuals.''

In the same case, with reference to determination of the loss suffered by the estate, the court observed:

"There is an inherent difficulty in placing a pecuniary value upon human life; and in an action for the wrongful death of a person, the amount of damages recoverable must depend very much on the good sense and sound judgment of the jury, upon all the facts and circumstances of each particular case."

*Rekdahl v. Cheney*, 134 Or. 251, 293 P. 412, was an action brought by the personal representative of the deceased to recover for the estate damages for the death of a boy less than nine years of age. It was therein contended, as in the instant case, that there was no evidence to show that the deceased would have accumulated any estate if he had lived. The court thus answered that contention:

"Appellant complains of the submission of this cause to the jury because of the assumed inadequacy of the evidence upon the question of damages. To adopt the reasoning of appellant upon this phase of the case would have the effect of holding that there can be no substantial recovery where children are the victims, because, at the time, they had no earning capacity. The statement of such a rule carries its own refutation."

The defendant in *Gabrielson v. Dixon*, 133 Or. 567, 291 P. 494, requested the trial court to instruct the jury that the plaintiff had failed to submit sufficient evidence from which it could be determined that the deceased would have saved or accumulated any money at the time of his death, and that if the jury should return a verdict in favor of the plaintiff, it should be for only nominal damages. The court refused to give the requested instruction and the only assign-

ment of error was thereon based. In affirming the judgment appealed from, this court stated:

"Because the evidence showed that he had accumulated practically no property and was working for but $3.60 per day, defendant contended that he was entitled to have the jury instructed to return a verdict for nominal damages only. While, as has been said, there is great difficulty in determining the value of a life, yet the amount of compensation to be recovered in actions of this nature is a question for the jury and not a question of law for the court. The instruction requested, if given, would have taken the case from the jury and determined as a matter of law that if plaintiff's intestate had lived he would have accumulated nothing during the remainder of his life. The amount of compensation to be recovered in the action 'must depend to quite an extent upon the good judgment of the jury upon a consideration of all the facts and circumstances of each particular case under proper instructions as to the law applicable thereto.' "

It is asserted in the defendant's brief that *Askay v. Maloney,* 85 Or. 333, 166 P. 29, is conclusive authority for the defendant's contention that the plaintiff is not entitled to recover in this action. In that case the personal representative of the deceased brought action against two police officers of the city of Portland and a surety company, to recover damages for the death of Walter E. Askay, who was about twenty-one years of age. The judgment appealed from was reversed for the reason that there was no evidence as to the life expectancy of the decedent and the jury was not instructed on that matter. This court did not reverse the judgment on the ground, as argued by the defendant, that there was a failure to prove what the decedent paid for his board or the net amount of his earnings per month.

In the instant case the instructions given in this connection were full and explicit and the defendant did not object to them. His complaint now is that the evidence is insufficient to support a judgment for damages in any amount. In our opinion, the circuit court did not err in refusing to grant either the defendant's motion for an involuntary nonsuit or his motion for a directed verdict.

■ It was proper for the plaintiff to show that the property which the surviving spouse owned was acquired through the joint efforts of husband and wife, and to show what were the duties of the wife, the decedent, in regard to conducting their home place.

■ Corporal Harrell, after telling his experience in traffic matters, was asked by counsel for the plaintiff this question:

"Under normal conditions—under normal weather conditions and normal conditions of ordinary black-top pavement such as are present on the Redwood highway, the point of this collision, suppose a car is traveling at fifty miles an hour, what is the distance in which that car can stop with safety?"

The defendant objected to the question on the ground that it did not take into consideration the weights of automobiles and differences in tires, and that a proper foundation had not been laid for the question. The witness then, in answer to a question by the court, stated that he was speaking of a late-model car with four-wheel brakes. The objection of the defendant was thereupon overruled, and the witness answered:

"The test of the national safety council is that at fifty miles an hour, under perfectly normal conditions, on a level, dry pavement, without any loose material on it, after brakes are applied, a car should stop within one hundred and eleven feet."

He further testified that a car traveling at the rate of sixty miles an hour, according to the same test, should stop within a distance of one hundred sixty feet; and at seventy miles an hour, two hundred eighteen feet. This witness also testified that he had personally made tests and demonstrations of the time in which automobiles could be brought to a stop at different speeds, and that such experiments had proved that the tests of the National Safety Council were "fairly accurate" under normal conditions.

On cross-examination of Corporal Harrell the defendant questioned him in considerable detail in regard to the weight of vehicles, the kind of tires and the condition of the pavement. The witness stated that all those matters were taken into account in arriving at the figures shown in the tables of the National Safety Council. Any deficiency in the showing of qualification of Corporal Harrell made by his testimony before answering the question was supplied on his cross-examination. Moreover, the defendant himself testified as to the kind of automobile he was driving and said that he could bring his car to a stop within ninety feet after applying the brakes, when driving at the rate of fifty miles an hour. His testimony in this respect was more favorable to the plaintiff than that given by Corporal Harrell, as some indication of the speed at which the defendant must have been traveling if his car made the skid marks in controversy.

■ The court instructed the jury as follows:

"Now we have no speed limit in this state. We formerly had but that has been abolished, and what the legislature has termed the 'basic rule' has been adopted for the purpose of governing speed. That basic rule reads as follows:

" 'No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway and the hazard at intersections and any other conditions then existing.

" 'Nor shall any person drive at a speed which is greater than will permit the driver to exercise proper control of the vehicle and to decrease speed or to stop as may be necessary to avoid colliding with any person, vehicle, or other conveyance upon entering the highway in compliance with legal requirements and with the duty of drivers and other persons using the highway to exercise due care; . . .'

"It is, of course, negligent to violate that rule."

The defendant excepted to so much of the foregoing instruction as had reference to caution in regard to a "vehicle, or other conveyance, upon entering the highway", pointing out that a private driveway intersects the highway where the collision occurred and claiming that "there was no evidence that any vehicle was entering or attempting to enter said driveway or entering upon the highway therefrom." He contends that there was no basis for that part of the instruction, that it was confusing to the jury and that reversible error was committed by the court in so charging the jury. That part of the above instruction to which the defendant objects was read verbatim from § 115-320, O. C. L. A. We do not believe that the jury could in any way have been confused or misled by the court's reading to it the statute relating to the basic rule.

■ Immediately after giving the foregoing instruction the court thus proceeded with its charge:

"It is also provided that:

" 'Any person who drives a vehicle upon a highway at a speed in excess of that indicated as follows for the particular district or location, and who, while so driv-

ing, violates the basic rule set forth in subdivision (2) (That is the subdivision I have read.) or any provision, of certain other sections that are not necessary now to refer to, shall be guilty of an offense, and that also, of course, would be negligence.

"(That is the subdivision I have read.) 'or any provision' of certain other sections that are not necessary now to refer to, shall be guilty of an offense, · and that also, of course, would be negligence.

"Now the legislature has gone on to provide for indicated speeds under various sections in towns, business districts and in residence districts of towns. An indicated speed outside of business or residence districts is forty-five miles per hour, so that if a person drives a vehicle upon the highway in excess of that indicated, that is, forty-five miles an hour, and while so driving violates the basic rule that I have read to you, then he is negligent, and if that negligence is the proximate cause of injury to another person, then that is an actionable injury for which damages can be recovered."

The defendant stated that his exception to the instruction was "being taken for the reason that in instructing the jury that there was an indicated speed at said point of forty-five miles per hour it tended to confuse the jury as to the law upon the subject relative to speed, and to naturally tend to lead them into believing that there was a definite speed limit at said place, and to give the jury a mistaken impression of the law relative to speed at said place"; and for the further reason that the supreme court of this state had held that indicated speeds "should not be read or given to the jury in cases of this character". The defendant relies on *Zeek v. Bicknell*, 159 Or. 167, 78 P. (2d) 620, as authority that indicated speeds should not be stated and that it was erroneous to include reference to them in the instruction.

In that case the plaintiff's decedent, a pedestrian, while walking across the super-highway at Milwaukie, Oregon, was struck and killed by an automobile driven by the defendant Bicknell and owned by the defendant Merwin. There was evidence on behalf of the plaintiff that the automobile was traveling at a speed of fifty to sixty miles an hour, "while the evidence of the defendant" placed "the speed at thirty-five miles an hour." The jury returned a verdict for the defendant and upon motion of the plaintiff the judgment rendered on the verdict was set aside and a new trial granted. From that order the defendants appealed.

The opinion set forth the instruction in regard to indicated speed, italicizing it as here appearing:

"*At the point in controversy the indicated speed is forty-five miles an hour. That is, the legislature has passed a law making specific allowance of forty-five miles an hour. That is their idea of what is reasonable in places where it is not a residential section or business section.* But that does not mean a motorist has to drive that fast. You have to take that in connection with the basic rule. That is, what is reasonable and prudent, having due regard to the traffic, surface and width of the highway and the hazard at intersections and any other conditions then existing. In some cases maybe ten miles would be too fast, and in other cases sixty would not be. You take the situation from the evidence whether the defendants were going too fast."

The opinion affirmed the order granting a new trial, holding that the instruction quoted was prejudicial to the plaintiff and that the court in charging the jury in similar cases "ought to define the meaning of the basic rule and omit mention of the indicated speeds."

It further pointed out that:

"Whether defendant was guilty of negligence in driving the automobile at the time and place in question is determined not by 'ordinary circumstances' but rather by the standard of care that an ordinarily prudent person would have exercised under all the existing facts and circumstances. Defendant, in driving the automobile, was obliged to exercise the degree of care commensurate with the danger involved, which, after all, is nothing more nor less than a statement of the essence of the basic rule."

In the case at bar, the trial judge, before giving the instruction hereinabove quoted, had told the jury that there was no speed limit in this state and then proceeded to read to the jury the law embodying the basic rule. He should not have brought into the case any mention of indicated speed. However, if any one was prejudiced by that instruction, we think that it was the plaintiff, for the reason that the jury might thereby have been led to believe that the defendant could not be held negligent unless he had exceeded the indicated speed and violated the basic rule simultaneously.

The eight remaining assignments of error have to do with the refusal of the court to give certain instructions requested by the defendant. One of the instructions requested was that the verdict of the jury, if for the plaintiff, be for nominal damages only. We have heretofore passed on the question raised by the assignment in regard to that matter. The substance of the other requested instructions, as far as within the issues of the case, was fully covered by the charge given to the jury.

We find in the record no reversible error. The judgment of the circuit court is affirmed.

Argued on rehearing September 8; former opinion and judgment of circuit court reversed September 15, 1942

ON REHEARING
(128 P. (2d) 956)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, RAND, ROSSMAN and BRAND, Associate Justices.

*Don R. Newbury,* of Medford, for appellant.

*A. C. Hough,* of Grants Pass (W. T. Miller and Orval J. Millard, both of Grants Pass, on the brief), for respondent.

BAILEY, J. In our former opinion herein, it was pointed out that the action was brought by the personal representative of the deceased for the benefit of her estate; that the case was tried in the circuit court on the theory that recovery, if any, would be for the benefit of the decedent's estate; and that our decision was based on that theory. It was further pointed out in that opinion that in 1939 the legislature amended § 5-703, Oregon Code 1930, by chapter 466, Oregon Laws 1939, and that the act as so amended (now codified as § 8-903, O. C. L. A.) gives a right of action to the personal representative of a decedent "for the benefit of the widow or widower and dependents and in case there is no widow or widower, or surviving dependents, then for the benefit of the estate of the deceased".

In the circuit court the defendant demurred to the complaint on the general ground that it did not state facts sufficient to constitute a cause of action; but the

record fails to show the reasons assigned by him, on presenting the demurrer, for contending that the complaint was insufficient. The demurrer was overruled. On rehearing the defendant has raised in this court for the first time the question of the sufficiency of the complaint. He now urges that the complaint fails to show any right of action whatever in favor of the personal representative of the decedent for the benefit of her estate. The objection that a complaint does not state facts sufficient to constitute a cause of action or suit is never waived: § 1-710, O. C. L. A. And according to rule 2 of this court (9 O. C. L. A., page 317), such objection may be taken at any time. We shall therefore now consider the sufficiency of the plaintiff's statement of his cause of action.

Frank P. Ross as administrator of the estate of Lyna M. Ross, deceased, brought the action for the benefit of that estate, and the only allegation of damage concerns loss to the decedent's estate. The complaint fails to state whether the deceased left any surviving spouse or dependents.

The answer alleges that Frank P. Ross was the husband of the decedent and was operating the automobile in which she was riding at the time she was injured. That allegation is admitted by the reply.

Section 8-903, O. C. L. A., under which this action was brought, thus reads:

"When the death of a person is caused by the wrongful act or omission of another, the personal representative of the former for the benefit of the widow or widower and dependents and in case there is no widow or widower, or surviving dependents, then for the benefit of the estate of the deceased may maintain an action at law therefor against the latter, if the former might have maintained an action, had he lived,

against the latter, for an injury done by the same act or omission. Such action shall be commenced within two years after the death, and damages therein shall not exceed $10,000.''

■ By force of the statute, an action brought for damages caused by the wrongful act or omission of another must be instituted by the personal representative of the deceased, for any beneficiary. This statute is definite and certain as to when an action may be maintained by the personal representative of a decedent for the benefit of the decedent's estate. It specifies that ''in case there is no widow or widower, or surviving dependents, then [the personal representative may maintain an action] for the benefit of the estate of the deceased''. The right of action is statutory and is granted to the personal representative for the benefit of those specified in the statute in the order therein named. It is only in the event of the non-existence of preferred beneficiaries that there is a right of action in favor of other beneficiaries.

In *Chicago, Burlington & Quincy Railroad Company v. Wells-Dickey Trust Company, Administrator*, 275 U. S. 161, 72 L. Ed. 216, 48 S. Ct. 73, 59 A. L. R. 758, action was brought under the federal employers' liability act by the trust company as administrator of the estate of a deceased employee of the railroad for the benefit of a sister of the decedent, alleged to be dependent. When the injured workman died he left surviving him his mother, who died, however, before any administrator of his estate was appointed. The federal employers' liability act, as noted in the opinion therein, provides that every common carrier by railroad shall be liable for damages in the case of the death of its employee ''to his or her personal representative, for the benefit of the surviving widow or

husband and children of such employee, and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee''. The court held that the sister was not entitled to damages, thus reasoning:

"The language of § 1 makes it clear that she is not. The cause of action as there expressed accrues to the widow and children, if either survives. It accrues to the parents if neither widow nor child survives. It accrues to the next of kin dependent upon the employe, only if there is no surviving widow, child or parent. There are, thus, three classes of possible beneficiaries. But the liability is in the alternative. It is to one of the three; not to the several classes collectively. * * *

"The cause of action accrues at the death [citing authority]. When it accrues, there is an immediate, final and absolute vesting; and the vesting is in that one of the several possible beneficiaries who, according to the express provision in the statute, is declared entitled to be compensated.''

See also, in this connection: *McFarland v. Oregon Electric Ry. Co.*, 70 Or. 27, 40, 138 P. 458, Ann. Cas. 1916B, 527; *Melton v. Southeast Portland Lumber Co.*, 160 Or. 500, 85 P. (2d) 1038; *Betz v. Kansas City Southern Ry. Co.*, 314 Mo. 390, 284 S. W. 455; *Butts v. City of Moultrie*, 39 Ga. App. 685, 148 S. E. 278; *Western & A. R. R. v. Allgood*, 41 Ga. App. 484, 153 S. E. 442; *Horrell v. Gulf & Valley Cotton Oil Co.*, 15 La. App. 603, 131 So. 709; 16 Am. Jur., Death, § 107, page 76.

■ Lyna M. Ross, deceased, left surviving her Frank P. Ross, her widower. The only action that could have been brought by the administrator was one for the benefit of the widower and dependents, if any. No right of action for the benefit of the decedent's estate ever

came into existence. Had the fact appeared from the face of the complaint that Frank P. Ross was the widower of the decedent, there is no question that the demurrer to the complaint would have been sustained, as it would have been manifest that no action could be maintained by the personal representative for the benefit of the estate of the deceased. Since that fact did not so appear, the question now arises whether it is necessary for the personal representative, in bringing an action for the benefit of a deferred beneficiary, to plead the non-existence of preferred beneficiaries. We believe that it is necessary. There is no right at common law to recover damages for death. The right exists only as conferred by statute. In the instant case an action could have been maintained for the benefit of Lyna M. Ross's estate only if the decedent had left no widower or dependents.

In order to maintain an action under the provisions of § 8-903, *supra,* for the benefit of a decedent's estate, the complaint must affirmatively show the non-existence at the time of the decedent's death of all the beneficiaries named in the statute ahead of the decedent's estate. Otherwise, the complaint does not show that any right of action exists for the benefit of the estate: *Niemi v. Stanley Smith Lumber Co.,* 77 Or. 221, 147 P. 532, 149 P. 1033; *Betz v. Kansas City Southern Ry. Co.,* supra; *Western & A. R. R. v. Allgood,* supra; *Horrell v. Gulf & Valley Cotton Oil Co.,* supra; *O'Donnell v. Wells,* 323 Mo. 1170, 21 S. W. (2d) 762.

In our opinion, the complaint herein fails to state a cause of action. Had the answer alleged that Lyna M. Ross was, at the time of her death, an unmarried woman without dependents, and the reply had admitted that allegation or the evidence had disclosed

such facts, a different question would be presented. In that event, the allegations of the complaint necessary to show that a cause of action existed for the benefit of the estate would have been supplied by subsequent pleadings or by the evidence.

It is argued by plaintiff that Frank P. Ross as an individual has waived his right as beneficiary, inasmuch as he is acting as administrator of his deceased wife's estate and is attempting, as such administrator, to recover damages on behalf of the estate. According to the statute the right of action for damages does not vest in a deferred beneficiary upon the failure of the primary beneficiary to assert his right, for the reason that the right of a deferred beneficiary depends wholly upon the non-existence of prior beneficiaries and not at all upon the failure of such beneficiaries to assert their rights.

The plaintiff also contends that the case was tried in the circuit court by both the plaintiff and the defendant on the theory that the estate of the decedent had the exclusive right of recovery, and that the defendant may not, on appeal, adopt a different theory. Regardless of the theory on which the case was tried in the circuit court, the defendant is not precluded from raising at any time the objection that the complaint does not state facts sufficient to constitute a cause of action. Not only so, but the evidence conclusively shows that no right of action ever accrued for the benefit of the decedent's estate.

The judgment appealed from is therefore reversed and the cause is remanded to the circuit court with instructions to set aside the judgment and sustain the defendant's demurrer to the complaint, and to entertain such further proceedings as may not be inconsistent with this opinion.