Argued September 8, affirmed as modified October 13, 1954,
petition for rehearing denied January 5, 1955

# DRAKE LUMBER COMPANY *v.* PAGET
# MORTGAGE COMPANY, PACIFIC BUILDING
# MATERIALS COMPANY

274 P. 2d 804

*Lowell C. Paget* and *Irving Rand,* of Portland, argued the cause and submitted briefs for Appellant, Paget Mortgage Company.

*Arthur H. Lewis,* of Portland, argued the cause and submitted a brief for Respondent, Drake Lumber Company.

*Robert F. Maguire* and *Randall B. Kester,* of Portland, filed a brief as amici curiae.

*B. A. Green, Donald S. Richardson, Burl L. Green* and *James B. Griswold,* of Portland, filed a brief for Oregon State Federation of Labor and Oregon State Building and Construction Trades Council as amici curiae.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, BRAND and PERRY, Justices.

LUSK, J.

Plaintiff, Drake Lumber Company, commenced two suits, each to foreclose a mechanic's lien for material furnished by it, and also liens of other suppliers of building material which had been assigned to it. The suits were consolidated for trial, and resulted in decrees foreclosing Drake's liens and fixing the order of priority as between such liens and liens of certain prior recorded mortgages upon the properties involved held

by the defendant Paget Mortgage Company. Paget appealed from portions of the decrees adverse to it, and the appeals were consolidated for hearing in this court. The only issues now remaining are those between Paget as mortgagee and Drake as lienor for materials which it furnished.

The assignments of error challenge the validity of such liens and, as well, provisions of the decree which gave them priority over the liens of Paget's mortgages.

Each of the liens is for material furnished by Drake to Hugh Lindquist, builder, for use in the construction of a frame dwelling house in Portland on land of which Zoe Lindquist was stated in the lien notices to be the owner or reputed owner. The contract price and reasonable value of the material furnished, as stated in the lien notices, is in each instance the sum of $1554.11. The houses were constructed on adjoining city lots known respectively as Nos. 4506 and 4516 N. E. 40th Avenue.

1. *Failure to Give Notice of Delivery of Material.*

The ground of challenge to the enforcibility of the liens first to be noticed is that Drake failed to allege or prove, in accordance with the requirement of ORS 87.020, that, not later than seven days after the first delivery of material, it gave written notice to the owner of the property that it had commenced to deliver material. Drake contends that the provision is not applicable because the amended complaint alleges, and the proof establishes, that Hugh Lindquist, the contractor, was the common-law agent of Zoe Lindquist, the owner of the land. Each of the amended complaints contains the following allegations:

"* * * that at the time said lumber and supplies were sold to said Hugh Lindquist, he was

acting on his own behalf and as common law agent of Zoe Lindquist, his wife, with full authority to bind her interest in said property for the purchase price of said lumber and supplies.

"V.

"That at the time claimant commenced to furnish said materials, the defendant Zoe Lindquist was the reputed owner of said property, and said construction was commenced and carried on with her full knowledge, approval and consent; that for a long time prior to November 24th, 1942, said Hugh Lindquist and Zoe Lindquist, his wife, were the owners of the land, as tenants by the entireties, upon which said building was constructed; that by deed recorded on the 24th day of November, 1942, in Book 720, at Page 456, of the Deed Records of Multnomah County, Oregon, said Hugh Lindquist attempted to convey of record to his wife, Zoe Lindquist, his entire interest in said real property; that in truth and in fact it was secretly agreed between said Hugh Lindquist and said Zoe Lindquist at the time said deed was executed and recorded, that she, the said Zoe Lindquist, should hold the title to said property in trust for herself and the said Hugh Lindquist, her husband, to the same extent as though said deed had never been executed; that said deed was thereafter, and by decree entered in this Honorable Court on the 4th day of November, 1943, in a cause entitled Martin T. Morlan, d.b.a. Morlan Plumbing Co., plaintiff, vs. Hugh Lindquist and Zoe Lindquist, defendants, (Clerk's No. 151-904), cancelled, set aside, and held for naught, as having been made, executed and delivered to defraud the creditors of said Hugh Lindquist and Zoe Lindquist; that in truth and in fact, said Hugh Lindquist and Zoe Lindquist, husband and wife, were the actual owners of said property at the time plaintiff commenced to deliver said materials."

█ It was further alleged that both Hugh Lindquist and Zoe Lindquist were indebted to plaintiff Drake in

the amount of the lien. The evidence, in our opinion, fully supports these allegations. In substance it is as follows: In the early part of 1942 Hugh and Zoe Lindquist were the owners as tenants by the entirety of Block 9, Going Street Addition in the city of Portland. Hugh Lindquist undertook the construction of fourteen houses on the property and finished and sold seven houses on the east half of the block facing on 41st Street. Paget loaned moneys secured by mortgages on the lots to enable Lindquist to finance the enterprise. Upon the completion of the first seven houses it developed that Lindquist was unable to pay his creditors, among whom was Drake. To enable Lindquist to proceed with the building program on the lots on the west half of the block, and thus, it was hoped, to liquidate his indebtedness to Drake and several other materialmen creditors, it was agreed that Lindquist should place the title to Lots 9 to 16 (comprising the west half of Block 9 and including the two lots in controversy in this case) in Mrs. Lindquist's name, and that all moneys remaining after payment of the construction costs should be paid over to these creditors up to the amounts due them. It was agreed that J. P. Lipscomb, who had made application on behalf of Lindquist to Paget for mortgage loans to finance the construction, should prepare vouchers for labor, make salary payments to Lindquist of $50.00 per week from the proceeds of the mortgage loans, and keep a complete record of all the transactions and submit it to the Lindquists and "interested creditors". This arrangement was confirmed by Hugh and Zoe Lindquist in a memorandum signed by them dated December 16, 1942. Prior to that Lindquist had conveyed his interest in the property to his wife by deed dated November 24, 1942, and recorded on the same day. As a part

of the same transaction, apparently, Mr. C. V. Drake, president of Drake Lumber Company, under date of December 18, 1942, initialed the following writing: "December 18, 1942. Top price any one house guaranteed by Drake Lbr. Co. C.V.D." The "top price" appears above the writing as $1286.94, being the average of the cost of materials used in seven houses previously built by Lindquist. Further, under date of November 30, 1942, the plaintiff Drake addressed the following letter to Paget:

"Paget Mortgage Company,
509 S. W. Stark Street,
City.

Gentlemen:
"This is to advise that we will furnish the necessary materials to Mr. Hugh Lindquist for the construction of houses on Lots 9 to 16 (inclusive) Block 9 Going Street Addition, this city. This is to include rough and finish lumber, sash and doors, siding, shingles, hardwood flooring, cement, lath & plaster and brick.
"We will furnish anything in our stock.
"Yours very truly,
Drake Lumber Company,
By C. V. DRAKE"

On November 3, 1943, a decree was entered by the Circuit Court for Multnomah County setting aside the deed from Hugh Lindquist to Zoe Lindquist as in fraud of creditors.

The learned circuit judge found that Hugh and Zoe Lindquist were engaged in a joint adventure for the construction of the houses, and therefore that the statutory requirement of seven days' notice of the commencement of delivery of materials was not applicable. There is evidence to support the court's conclusion.

But, even though there was no joint adventure, the inference that Hugh Lindquist was his wife's authorized agent to purchase materials to be used in the houses, is inescapable. For she was not only fully apprised of the details of the plan of procedure which we have outlined and the object to be accomplished by it, but was herself a party to it, having signed the memorandum of December 16, 1942, which clearly comprehends the granting by her to her husband of the authority in question.

2. Defendant Paget contends, however, that whether Hugh Lindquist was his wife's common-law agent is immaterial, because, it is urged, the statute which requires notice to be given to the owner of the land of delivery of materials "to a contractor or agent" (ORS 87.020) applies equally whether the person receiving such delivery is the statutory agent of the owner, as defined in ORS 87.005, or the owner's common-law or general agent. The point is ruled squarely against this contention by *Drake Lumber Co. v. Lindquist,* 179 Or 402, 170 P2d 712 (referred to in the briefs as the Doll case), which was a suit to foreclose a lien against one of the lots in Block 9, Going Street Addition, and involved the identical transaction now before the Court. We held in that case:

> "When material is furnished to the owner, or the common law or general agent of the owner, as distinguished from the statutory agent, the giving of the notice referred to in § 67-101 [ORS 87.020], *supra,* is not required (citing cases). Whether Hugh Lindquist, the person to whom the material was furnished, according to the statements in the notice and the allegations of the complaint, was an agent under the statute or had authority to bind Zoe Lindquist, his wife, who is designated in the notice as the owner or reputed owner of the property, is

a matter of pleading and proof (citing cases)." (Pp. 416, 417.)

We reversed the decree of the Circuit Court dismissing the suit after sustaining a demurrer to an amended complaint, the allegations of which, as they relate to the present question, were in substance identical with those in the amended complaints in these cases which we have quoted above. It is argued by counsel for Paget that the decision should be restricted to a case where "material is purchased for the account of an owner, either by the owner in person or by an agent." But the opinion contains no such limitations and none can be read into it, for the complaint in the Doll case alleges that the "lumber and supplies were sold to said Hugh Lindquist" just as do the amended complaints in this case. The lien notice in that case stated (as do the lien notices here) that the materials were furnished "to, and at the special instance and request of Hugh Lindquist" and that "Zoe Lindquist was the owner or reputed owner of said land and the building * * * thereon" at the time claimant commenced to furnish materials. With reference to these statements we said:

"* * * By filing such a lien notice the claimant is not precluded, however, from showing that the person to whom the materials were furnished was the common-law agent of the one named in the lien notice as the owner or reputed owner of the property, nor is he precluded from showing that someone, other than the reputed owner, owns, or has an interest in, the property. It was therefore permissible for the plaintiff to allege, as it did in its amended complaint, that Hugh Lindquist, in purchasing the materials, was acting on his own behalf and as common-law agent for his wife, and that during the time the materials were being furnished, Zoe Lindquist held the legal title to the property in

her own name 'in trust for herself and the said Hugh Lindquist' as tenants by the entirety. Such allegations were erroneously stricken out by the court.'' (179 Or 418.)

The Doll case, therefore, is a controlling precedent here and requires a holding that failure to give the statutory notices did not impair the validity of Drake's liens.

### 2. *Allowance of Amendments to Complaints.*

The original complaints in the present cases, which were filed June 14, 1944, did not contain the allegations of the amended complaint which we have quoted above. The amended complaints were filed on November 26, 1948. On April 24, 1950, on motion of Paget, these pleadings were stricken from the files, for the reason, as recited in the court's orders, that the original complaints failed to state a cause of suit because they contained no allegations of compliance with § 67-101, OCLA (ORS 87.020), and the amended complaints were filed more than six months after the filing of the liens, and therefore the causes of suit therein stated were barred under the limitation of § 67-107, OCLA (ORS 87.055) (requiring that suit to foreclose must be commenced within six months after the lien is filed).

■ Upon the trial counsel for Drake moved for leave to amend the original complaints so as to incorporate the allegations with reference to the agency of Hugh Lindquist and his wife and the transfer of the title to the property to Zoe Lindquist which we have quoted—in other words, to reinstate the stricken amended complaints. The court permitted the amendments, and the ruling is challenged on two grounds, first, that upon the filing of the amended complaints the original complaints ceased to be a part of the record,

and, therefore, after the amended complaints were stricken from the files, there were no pleadings left to amend; and, second, that the original complaints did not state a cause of suit and were a nullity and could not be amended after the six months' statute of limitations had run. As to the first objection, it is sufficient to say that we have heretofore held that the effect of an order striking an amended pleading is to restore the original pleading. *Abrahamson v. Northwestern P. & P. Co.*, 141 Or 339, 348, 15 P2d 472, 17 P2d 1117. This is the rule in other jurisdictions, as shown by the authorities cited in the opinion in that case. See, also, 71 CJS 1058, Pleading § 509.

■ The other ground of challenge to the allowance of the amendments calls for consideration of the general rule that where an amended complaint, which introduces a new and different cause of action from that stated in the original complaint, is filed after the period of limitations has run, it will be regarded as the commencement of a new action which does not relate back to the time when the original complaint was filed and therefore is barred by the statute of limitations. See *Fox v. Ungar,* 164 Or 226, 98 P2d 717. The application of the rule in the case cited was disapproved as too strict in *Ross v. Robinson,* 174 Or 25, 147 P2d 204. We think that under the modern and more just and liberal view, which was fully developed by reference to the authorities in the Ross case, the allowance of the amendments in this case was proper. The precise point of attack here is that the original complaints did not state any cause of suit whatever. But that was also one of the claims of the defendant in the Ross case, which was a statutory action for death by wrongful act brought on behalf of the estate of the deceased and in which the original complaint failed

to negative the existence of the preferred beneficiaries named in the statute. We had previously held that the complaint was demurrable in *Ross v. Robinson,* 169 Or 293, 124 P2d 918, 128 P2d 956. None the less, we ruled on the second appeal that an amended complaint which supplied the necessary averments was not vulnerable to demurrer on the ground that the action was barred by the statute of limitations, although such amended complaint was not filed until more than two years after accrual of the cause of action. We quoted with approval the pronouncement that an amendment should be allowed which "does not operate totally to confer jurisdiction" but merely supplies "an additional jurisdictional averment essential to clothe the court with complete power to conduct the suit to a legal conclusion", *Neubeck v. Lynch,* 37 App (DC) 576, 37 LRA (ns) 813, and the statement of Mr. Justice Holmes in *New York C. & H. R. R. Co. v. Kinney,* 260 US 340, 67 L ed 294, 43 S Ct 122, that "when a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the Statute of Limitations do not exist, and we are of opinion that a liberal rule should be applied." Each of the original complaints in the instant case alleged that plaintiffs furnished materials to the defendant, Hugh Lindquist, at his special instance and reqeust, to be used in the construction of a building on described property, and that "the defendants Hugh Lindquist and Zoe Lindquist, husband and wife, were the owners or reputed owners of said property, and said construction was commenced and carried on with their full knowledge, approval, and consent." We are not prepared to say that in the absence of demurrer these allegations would not have been deemed sufficient to charge that Hugh Lindquist

was agent for his wife in the transactions. But, that apart, we hold that, under the principles approved by us on the second appeal of *Ross v. Robinson,* the amendments were properly allowed and related back to the time the original complaints were filed. *Andersen v. Turpin,* 172 Or 420, 429, 142 P2d 999. To hold that the filing of the amended complaints was tantamount to the commencement of new suits, and therefore that plaintiff is barred by the statute of limitations, would be to revive theories touching procedure which we discarded in *Ross v. Robinson.*

### 3. *Claim of Padding of Account.*

Another ground of invalidity of the liens asserted by Paget is that in each instance the amount claimed in the notice of lien is "purely fictitious."

The statute gives a lien to any "person  *  *  * furnishing any material to be used in the construction of any improvement  *  *  * for the  *  *  * material furnished  *  *  *" ORS 87.010, and provides that a person claiming the benefit of that section "shall file for recording with the recording officer of the county in which the improvement  *  *  * is situated, a claim containing a true statement of his demand, after deducting all just credits and offsets". ORS 87.035.

The evidence shows that all material ordered by Lindquist from Drake was delivered by Drake to the property on which it was to be used, but that some material ordered for one house was used by the contractor in the construction of the other, and that in addition, possibly, "a very little of it", as Lindquist testified, was used in a third house, which was also under construction. The amount claimed in each of the lien notices was, as stated, $1554.11, and was arrived at

in the following manner, according to the witness Bennett, credit manager for Drake: As evidenced by the prices charged in the load tickets which were issued with each delivery of material the total price for material delivered to No. 4506 N. E. 40th Street was $1679.28; that for material delivered to No. 4516 N. E. 40th Street was $1453.44. The price charged for material furnished for use in building the third house above mentioned was $1531.11. The total of these three sums, to wit, $4663.83, was divided by three and the resulting quotient, $1554.61, was taken as the amount properly chargeable against each property and the amount set up in the lien claims. Vouchers for such amounts drawn on Paget by Lindquist were delivered to Drake. The uncontradicted evidence is that the prices charged in the load tickets were reasonable.

Bennett, who qualified as an expert witness on the subject, testified that he made an inspection of the two houses after they were completed, from which he determined that material of the kind and character furnished by Drake and actually used in No. 4506 was of the reasonable value of $1429.10 and in No. 4516 was $1545.60.

The total of the prices charged in the load tickets for material furnished by Drake for both houses involved is $3132.72, or $24.50 in excess of the sum of the amounts claimed in both lien notices. The houses are substantially of the same size, though house No. 4516 is somewhat larger than house No. 4506. The third house mentioned is of comparable size to the other two. As testified to by Bennett, the reasonable value of the material furnished by Drake that went into house No. 4516 is $125.01 less than the amount of the lien, and the reasonable value of the material which went into house No. 4506 is $8.51 less than the

amount of the lien. The total of the prices indicated in the load tickets for material delivered to house No. 4506 is $125.17 in excess of the claim, and the total of such price for material delivered to house No. 4516 is $100.67 less than the claim.

No attempt was made by Paget to dispute Bennett's estimate of the quantity and value of materials furnished by Drake and which were actually used in the houses involved, nor to question the reasonableness of the prices shown on the load tickets. Apart from the discrepancies in the amounts of the liens and the figures above stated Paget relies on the following facts: First, it is asserted that the claim is greatly in excess of the "contract price" of $1286.94 "guaranteed" as the top price for materials in any one house in the memorandum initialed by Mr. Drake to which we have referred. But in our opinion this memorandum did not amount to a contract; it bound Lindquist to nothing and was a mere offer which was never accepted by him, for, as the record discloses, Lindquist felt free to buy material from other materialmen than Drake and did so. It is shown without contradiction that, due to war conditions, costs had mounted between the time of the signing of this memorandum and the furnishing of the materials, and that the prices charged were reasonable. Next Paget points to a sworn bill of particulars filed by Drake in the case relating to house No. 4506 and which showed a total charge of $1471.30 for material furnished to be used in that house, or approximately $83.00 less than the amount of the lien.

■ The rule governing the question thus presented is that where the claimant has intentionally or through culpable negligence overstated the amount due him such overstatement will render the whole lien void, but a mere mistake in the statement will not necessarily

render the whole lien void when it is evident that no fraud is intended, and where it has not misled the defendant owner to his prejudice in making his defense. *Bartels v. McCullough,* 102 Or 66, 70, 201 P 733, and cases cited. See, also, *Northwest Lbr. & Fuel Co. v. Plantz,* 126 Or 69, 73, 227 P 1116, 268 P 763; *Davis v. Bertschinger,* 116 Or 127, 133, 241 P 53; *Cooper Mfg. Co. v. Delahunt,* 36 Or 402, 407, 51 P 649, 60 P 1 (1898). As an example of an overstatement which will void the lien see *West v. Wilson,* 136 Or 262, 266, 297 P 847, where this court held that a claim in a notice of lien for $1826.00, when the greatest amount plaintiff would be entitled to according to his contract after deducting an admitted credit, would be $820.00, "was not a mistake but an intentional overstatement."

■■ The evidence does not convince us that Drake either intentionally or through culpable negligence overstated its claims. The difficulty which is encountered in arriving at a strictly accurate statement was not of its own making, but arose from the use by the contractor in one house of material furnished for use in another. This Drake could hardly have prevented "for it cannot be expected that a materialman would be obliged to watch the progress of a structure, to see that every stick of material so supplied by him was used therein". *Fitch v. Howitt,* 32 Or 396, 409, 52 P 192. Ordinarily, as the cited case holds, the burden is on the defendant to show that material delivered for construction of a building was not used therein. See, also, *Northwest Lbr. & Fuel Co. v. Plantz,* supra; *West Side Lumber & Shingle Co. v. Herald,* 64 Or 210, 216, 128 P 1006. In the instant cases, however, plaintiff's own proof showed that to some extent material intended for use in one house was used in the other, and, possibly, a small quantity in a third house. In this situation it

would seem to be incumbent upon the plaintiff to go forward and establish as best it may the quantity and value of the material furnished which was actually used in the particular improvement. This the plaintiff undertook to do, and the evidence it produced stands uncontradicted and is not unreasonable, either inherently or in respect to the other evidence in the case. We think that the just and equitable conclusion is that the amounts to be allowed should be based on the estimates of the witness Bennett, to wit, $1429.10 for house No. 4506 and $1545.60 for house No. 4516. The discrepancy between these amounts and the amount of the demands in the lien notices is not so great as to lead to an inference either of dishonesty or negligence, or to warrant a court in declaring the liens void in their entirety.

### 4. *Claim of Joint Adventure.*

■■ The final objection to the validity of the liens is based upon the claim that Drake was engaged in a joint adventure with Lindquist in the construction of the houses. Authorities are cited to the effect that a person will not be permitted to enforce a lien on his own property to the prejudice of third persons holding similar liens. It is argued that the arrangement concluded by Lindquist and his wife and Drake and other creditors of Lindquist (described earlier in this opinion), pursuant to which the houses were built, resulted in the creation of a joint adventure between Lindquist and the creditors. But joint control and proprietorship, as well as an agreement to share the profits, are generally essential to a joint adventure. *Portland Trust & Savings Bank v. Lincoln Realty Co.,* 180 Or 96, 123, 170 P2d 568. Neither of these elements is found in the transaction under consideration. Lind-

quist's agreement to apply the profits to the payment of his indebtedness to Drake and other creditors did not constitute an agreement for the sharing of profits. On the contrary, it contemplates that any profits that might be made were to belong to Lindquist, or to Lindquist and his wife, and not to his creditors. We think that this contention is wanting in substance.

### 5. *The Question of Priority.*

By the decrees the mechanics' liens of plaintiff Drake were given priority over the liens of defendant Paget's mortgages, although the latter were executed and recorded prior to the creation of the former. Contending that this was error, counsel for Paget urge upon the court a re-examination of its decisions construing the statute which governs this question. That statute is ORS 87.025, Subdivisions 2 and 3. So far as pertinent to the present discussion it reads:

"(2) All liens created under ORS 87.010 upon any improvement shall be preferred to all prior liens, mortgages or other encumbrances upon the land upon which the improvement was constructed; and [in] enforcing such lien, the improvement may be sold separately from the land, and, when so sold, the purchaser may remove the same, within a reasonable time thereafter, not to exceed 30 days, upon the payment to the owner of the land of a reasonable rent for its use from the date of its purchase to the time of removal; but if such removal is prevented by legal proceedings, the 30 days shall not begin to run until the final determination of such proceedings in the court of first resort, or the appellate court if appeal is taken."

(Subdivision 3, enacted by Oregon Laws 1939, ch 527, requires a seven-day notice of the delivery of material to be given to the owner of record of such prior recorded mortgage.)

The language just quoted was a part of the mechanic's lien law enacted in 1885, Laws 1885 p. 14 § 3, and has remained unchanged from the time of its enactment to this day. In 1882 the court decided the case of *Inverarity v. Stowell,* 10 Or 261, which involved a question similar to that now before us. The statute under which that case arose contained no provision giving priority to a mechanic's lien over a prior recorded mortgage. The court applied the common-law rule that the building became a part of the land and subject to the lien of the mortgage as soon as it was annexed, and held that it had no power to postpone the prior lien of the mortgage to the mechanic's lien as to any portion of the property, either the land or the building. The present statute was first construed in 1898 in *Cooper Mfg. Co. v. Delahunt,* supra, in an opinion by Mr. Justice ROBERT S. BEAN. The question presented was whether a lien for material furnished for the erection of a dwelling house upon premises on which there was a mortgage recorded before commencement of construction should be given priority over such mortgage as to the building alone. The court said:

"* * * The statute is not clear, but it seems to us that its evident meaning is that all mechanics' liens shall attach to the building or other improvement in preference to prior liens, mortgages, or other incumbrances upon the land, whether such mechanic's lien is for the original construction, or the alteration or repair of the building. It provides, in effect, that the liens created by this act upon any building or other improvement shall be preferred to all prior liens on the land upon which such building or other improvement shall have been constructed, or upon which it was situated when altered or repaired."

This construction was announced in answering the contention of the holder of the mortgage that the

priority granted by the statute to a mechanic's lien
was for an alteration or repair of the building only,
and not on account of its original construction. What
was said in the opinion concerning liens for the altera-
tion or repair of the building is concededly dictum, as
the case involved no such liens. The dictum has since
been overruled. *Bratzel v. Stafford,* 140 Or 661, 14
P2d 454, 16 P2d 991; *Residential Finance Co. v. Larkin,*
149 Or 410, 40 P2d 1008. These cases are in no sense
authority for Paget's position. All that they actually
decided was that under the particular facts of each
case the mechanics' liens for alteration or repair of
a building were inferior to prior recorded mortgages
upon the land and building. This is true also of *Wagner
v. Shaw,* 6 Alaska 647, and the unreported decision
of Federal Judge Robert S. Bean in *Stockton Box Co.
v. Shasta View Lumber and Box Co.,* which is cited in
*Bratzel v. Stafford* at pp. 666-668. Whether, in view
of some of the language in the opinion of Mr. Justice
CAMPBELL in *Bratzell v. Stafford* (see pp. 664, 665),
there may be circumstances under which priority
will be accorded to a mechanic's lien for alteration or
repair of a building over a previously recorded mort-
gage upon the land and the building, is a question upon
which we express no opinion because it is not before
us. But the construction of the statute with respect
to the question actually involved in *Cooper Mfg. Co.
v. Delahunt*—which is the precise question to be de-
cided here—has, so far as we have been able to deter-
mine, never been departed from in any subsequent de-
cision of this court. On the contrary, the correctness
of that construction seems to have been recognized
by the court in *Bratzel v. Stafford,* supra, and *Pacific
Spruce Corp. v. Ore. Cement Co.,* 133 Or 223, 286 P
520, 289 P 489, 72 ALR 1507; and, until this day, it

has not been challenged in this court since the decision was rendered more than 50 years ago.

Meanwhile, the legislature has met many times without amending the statute (save in a particular not here pertinent), thus indicating legislative approval of this court's interpretation of its meaning. The decision has become a rule of property. The court should certainly not be moved to change it by views pressed upon us in argument regarding the expediency of the statute. "The wisdom or policy of such an enactment is a matter exclusively for legislative consideration." Phillips on Mechanics' Liens (3d ed) 423 § 238. Nor is there room for the contention that the statute, as we have construed it, is unconstitutional. That question would seem to be set at rest by *Haines Commercial Co. v. Grabill,* 78 Or 375, 382, 383, 152 P 877. See 121 ALR 618 and Phillips, op. cit., where the author says: "It is competent to the legislature to give the mechanic, on the building he erects, a lien having priority over a previously recorded mortgage on the land." The decision in *Pacific Spruce Corp. v. Ore. Cement Co.,* supra, relied on by Paget, involves an entirely different question. That question, as stated in the opinion by Mr. Justice RAND, was "whether the lien of a duly recorded purchase price mortgage which was executed simultaneously with a deed conveying the mortgaged land is entitled to priority of payment, *not as to the building but as to the land itself,* over liens for labor and material furnished to the vendee for a building upon which work had been commenced by the vendee before acquiring title to the land". (Italics supplied.) Mechanics' liens against the building were not involved. They were given priority in the decree of the Circuit Court, and such priority was not challenged on appeal by the mortgagee. The court held that, under

a proper construction of the statute, the mortgage was entitled to preference over the liens for labor and material, and that any other construction would render the statute unconstitutional. It was said in the course of the opinion that the primary purpose of the statute was to secure and protect laborers and materialmen for the labor and material furnished in the construction of buildings, and that the statute should be liberally construed to accomplish that purpose, but that, insofar as the statute may subject the owner of the land to the payment of another person's debts for which he is in nowise responsible and deprive him of his property without fault upon his part, the statute should be strictly construed.

There is a wide difference between according priority to mechanics' liens against a building over a previously recorded mortgage of the land, and the allowance of the priority claimed for mechanics' liens in the circumstances of the Pacific Spruce Corporation case. The constitutional objections which the court avoided by denying such preference are not present in the cases now under consideration.

Finally, it is argued that, regardless of all other questions, the statute was never intended to apply to so-called construction mortgages. That is to say, mortgages given to secure future advances made from time to time in aid of the construction of an improvement. Of this kind are the mortgages in these cases. We are told in the briefs of counsel that this method of financing was unknown in 1885 when the statute was passed. We seriously doubt that this would be a controlling consideration if it were a fact. But counsel are wrong in their history. The first edition of Phillips on Mechanics' Liens, published in 1874, contains in § 236 a discussion of cases dealing with mortgages of

that sort. Moroney's Appeal, 24 Pa St 372, which is cited in defendant Paget's brief, involves such a mortgage given in August, 1849. But, putting this to one side, the authorities say that

> "the general rules governing priority between mechanics' liens and mortgages ordinarily are deemed applicable notwithstanding the loan secured by the mortgage was made with the purpose, understanding, or expectation that the proceeds thereof would be used in improving the property or the mortgage was given to secure a debt for work done on, or materials furnished for, the building." 57 CJS 760, Mechanics' Liens § 201.

See *Union Loan & Savings Ass'n v. Johnson,* 118 Neb 17, 223 NW 467; *Carriger v. Mackey,* 15 Ind App 392, 44 NE 266; *Kendall Mfg. Co. v. Rundle,* 78 Wis 150, 47 NW 364. In *Union Loan & Savings Ass'n v. Johnson,* supra, a contention was advanced which is the converse of the contention of the mortgagee in this case. It was said:

> "Appellee contends, and the trial court apparently had the theory that, inasmuch as the material furnished to defendant Johnson went to enhance the value of the property upon which plaintiff held mortgages, therefore the mortgages would be subordinate to the mechanics' liens. That, however, is not the law." 118 Neb 23.

In *Carriger v. Mackey,* supra, the court said:

> "The appellants insist, that the facts found show no equity in the appellee, which entitles him to a lien superior to the mortgage of John J. Carriger, given for debts due for materials used and labor performed in the construction of the building. We are unable to perceive by what rule the appellants who have mortgages, are entitled to priority on the building. It can make no difference what the mort-

gages were given to secure. They have priority only upon the real estate as it stood at the time of their execution." 15 Ind App 394.

■ Our statute makes no exception, but manifestly refers to all prior recorded mortgages, whether given for future advances to aid in construction or not. We are not at liberty to import exceptions into the statutes because of possibilities conjured up by counsel that the expectations of a mortgagee concerning the security which he is receiving will be disappointed.

■ In conclusion upon this phase of the case it is our opinion that, when the new mechanic's lien law was passed in 1885, the provision giving priority to mechanics' liens over prior recorded mortgages was adopted in order to supply what was considered to be a defect in the prior law, as construed in *Inverarity v. Stowell*, supra. That case was decided only three years before the enactment of the present statute, and we are satisfied that the decision in *Cooper Mfg. Co. v. Delahunt*, supra, properly construed the statute to mean that mechanics' liens for material furnished for original construction are preferred so far as the building is concerned to the liens of prior recorded mortgages on the land.

## 6. *Conclusion.*

The decree in each case, after providing that the building should be first offered for sale separate from the land and that the purchaser should remove the building within 30 days after the sale (unless prevented by legal proceedings), next directs that the land be offered for sale and, in case the building is not sold separate from the land, that the building and land then be sold together. It then provides that the proceeds

of sale, both of the building and of the land, or of the building and land if sold together, be applied as follows:

"FIRST: To the costs of the sale or sales;

"NEXT: To pay to plaintiff the sum of $1,554.11 and the further sum of $6.25 with interest on said sums at the rate of 6 percent per annum from the 21st day of March, 1944, and the further sum of $200.00 attorney's fees and costs and accruing costs;

"NEXT: To pay to defendant, Paget Mortgage Company, the sums decreed payable to said defendant by this decree, to-wit: the sum of $7,037.75 with interest thereon from the 31st day of December, 1943, at the rate of 4½ percent per annum and the further sum of $650.00 attorney's fees and costs and accruing costs."

In thus giving the plaintiff's liens priority over Paget's mortgages, not only as to the buildings but as to the land as well, the decree is erroneous.

In the brief on behalf of Paget error is assigned to the allowance by the court of three liens for materials assigned to Drake and a lien of Pacific Building Material Company. The decrees give Paget's mortgages priority both as to the land and building over these liens. The owners of the property have defaulted, and there is no one before the court on this appeal with standing to contest them. This assignment of error, therefore, presents no question for our consideration.

It follows that the decrees appealed from should be modified as above indicated with respect to the amounts of plaintiff Drake's liens and by eliminating the priority granted to such liens as to the land, and as so modified the decrees will be affirmed.

The cause will be remanded to the Circuit Court for the entry of such a modified decree, which, when entered, will stand as the decree of this court. No costs or disbursements will be allowed.