Argued September 5, affirmed October 9, 1963

# HAYES *v.* KILLINGER ET AL
### 385 P. 2d 747

*Charles D. Burt,* Salem, argued the cause and filed the brief for appellant.

*David Landis,* Portland, argued the cause for respondent Wallace. On the brief were Howard K. Beebe and Maguire, Shields, Morrison, Bailey & Kester, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff Dale Hayes, from a judgment of involuntary nonsuit which the circuit court entered in favor of the defendant, Lloyd Wallace. The alleged cause of action which terminated in that manner arose from injuries which the plaintiff sustained when his right arm was caught in a corn picking machine which was operated on Wallace's farm in Marion County. In addition to Wallace, the complaint made as parties defendant three individuals by the name of Killinger. It alleged that the four were joint adventurers in harvesting corn and operating the machine. It charged that the four should be held jointly and severally liable for the plaintiff's injuries. The motion of Wallace for an involuntary nonsuit which was made at the close of the plaintiff's case in chief was sustained by the trial judge on the ground that the record contained no evidence of a joint adventure. This appeal challenges that ruling. The Killingers are not parties to this appeal.

The defendants Killinger were engaged in the business of farming in Marion County as partners under the name of George Killinger & Sons. Sometime in 1959 or 1960 they purchased a corn picking machine for the purpose of harvesting their own corn crop and operating the machine on a custom picking basis on other farms in the area. The corn picker was a power driven machine mounted on a farm tractor and used for picking the ears of corn from the stalks in the field. Two trucks were required for the continuous and efficient operation of the picker; one operated along side the machine and received the ejected ears of corn while the other hauled the corn to the cannery. Defendant Wallace owned a truck and was engaged by the Killingers in 1960 to assist in the custom pick-

ing operation by providing one of the two required trucks.

The farmer whose corn was being harvested was charged a stated price per ton for picking and hauling the corn—usually between $5.50 and $6.00 depending on the distance the corn was transported. The Killingers collected the total charge for picking and hauling the corn from the farmer and deposited the receipts in the business account of George Killinger & Sons. They then paid Wallace a stated amount per ton of corn that he hauled based on "weight slips" that he received from the cannery when the corn was delivered.

Wallace paid all the expenses incidental to his truck—gas, oil, repairs and insurance—and realized as "profit" the amount remaining after his expenses were paid. The Killingers retained the amount collected for picking the corn and the amount paid for hauling by the other truck which they owned, and operated. The expenses of operating the corn picker and the tractor on which it was mounted were borne entirely by the Killingers. They calculated their profits by deducting these expenses from the amount collected for picking and hauling. Ralph Killinger testified that they also deducted the amounts paid to Wallace for hauling in determining the profit derived from the corn picking operation. To illustrate this significant point we shall assume that a farmer is charged $6 per ton for picking and hauling his corn. This $6 per ton would be collected by the Killingers who would deduct (1) $2.50 per ton paid to Wallace for the amount of corn he hauled, (2) the expense of operating their truck, and (3) the operating expense of the corn picker and tractor. The remainder, if any, would be the profit derived by the Killingers. There were other minor incidental expenses which the Kil-

lingers paid such as the expenses of keeping the accounts, of banking the receipts of the operation and of entering into agreements with the farmers to harvest their corn. Wallace, in figuring his gain or loss, would deduct the expense of operating his truck from the $2.50 per ton received from the Killingers.

September 8, 1961, the day of the plaintiff's injury, the machine was being operated during the hours of darkness with the aid of artificial lighting equipment attached to the machine. The plaintiff, who was hired and paid by the Killingers, rode on a small platform attached to the rear of the picker. His duties consisted of lubricating the machine and, if it became clogged, removing grass, weeds and corn stalks that became impaled on the operating parts. In the instance which resulted in his injury the plaintiff was preparing to unclog the picker when his right arm became entangled in the operating machinery. Subsequently, he and the Killingers severed his arm with a pocket knife to free him from the machine and he was rushed to a hospital where the amputation was surgically completed. As a result appellant lost the lower portion of his arm from above the elbow.

Subsequent to the commencement of this action the plaintiff, in consideration of $20,000 executed with the Killingers a covenant not to sue them and to hold them harmless from any judgment that may arise from the injury. He then proceeded against Wallace individually on the theory he was jointly and severally liable.

Defendant Wallace pleaded a separate defense and sought a permanent injunction against the plaintiff's prosecution of such a cause of action against him. The trial court sustained the plaintiff's demurrer to this separate defense and Wallace prosecutes a cross-

appeal. Since we will affirm the trial court's disposition of the motion for nonsuit, it is unnecessary to consider the cross-appeal. As the plaintiff admits, Wallace can be liable only if he is a joint adventurer with the Killingers.

■ In assessing the trial court's disposition of the motion for involuntary nonsuit, it is our duty to view the evidence in the light most favorable to the opponent of the motion.

Plaintiff contends the question of joint adventure should have been submitted to the jury as a question of fact. *Preston v. State Industrial Accident Commission,* 174 Or 553, 149 P2d 957, quotes with approval the following from 47 CJ 773:

> "What will constitute a partnership is a matter of law, but whether the partnership exists under the evidence is one of fact for the jury, unless, in the opinion of the Court, but one inference can be drawn by reasonable men."

Uniting these principles, we must view the evidence in a light most favorable to the plaintiff to determine whether it justifies the single inference in the minds of reasonable men that a joint adventure did not exist between Wallace and the Killingers in the corn picking operation. The evidence must be viewed in the proper framework of applicable law. Consequently, we must determine what constitutes a joint adventure as a matter of law.

■ The principal difference between a joint adventure and a partnership is that a partnership is ordinarily formed for the transaction of general business of a particular kind while a joint adventure is usually limited to a single transaction. This distinction is of little importance to our deliberations in this case;

and although in a strict legal sense the difference does exist, the rules applicable in determining the existence of a partnership form the criteria of existence of a joint adventure. *McKee v. Capitol Dairies,* 164 Or 1, 99 P2d 1013; *Preston v. State Industrial Accident Commission,* 174 Or 553, 149 P2d 957; *Wheatley v. Carl Halvorson Inc.,* 213 Or 228, 323 P2d 49.

The essential test in determining the existence of a partnership is whether the parties intended to establish such a relation. Given the multiplicity of legal consequences that flow from a partnership, we should not surprise the parties into such a relationship against their will. However, a disinclination to assume the burdens of a patrnership does not necessarily preclude the creation of that relationship, since the substance of legal intent rather than the actual intent may be controlling. In the absence of an express agreement codifying the relationship, the status may be inferred from the conduct of the parties in relation to themselves and to third parties. In other words, if they function as a partnership, they must assume the attendant duties and liabilities. *Preston v. SIAC,* 174 Or 553, 149 P2d 957; *First National Bank of Eugene v. Williams,* 142 Or 648, 20 P2d 222; *Worden v. Beals,* 120 Or 66, 250 P 375.

In placing the conduct of these parties in the framework of a partnership, no one factor is absolutely determinative; the entire factual setup must be examined as a whole. But when faced with the intricate transactions that arise, this court looks mainly to the right of a party to share in the profits, his liability to share losses, and the right to exert some control over the business. Those are deemed the earmarks of a partnership. *Cogswell v. Wilson,* 11 Or 371; *Kelley v. Bourne,* 15 Or 476; *Flower v. Barnekoff,* 20 Or 132;

*Hansen v. Bogan,* 127 Or 399, 272 P 668; *First National Bank of Eugene v. Williams,* supra. We proceed to a consideration of these three factors individually.

### I Sharing of the Profits

The Uniform Partnership Law, adopted in Oregon in 1939, provides: (ORS 68.120)

"In determining whether a partnership exists, these rules shall apply:

\* \* \*

"(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

"(4) The receipt by a person of a share of the profits of business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

\* \* \*

"(b) as wages of an employe or rent to a landlord;"

■ It is well settled in Oregon that the receipt by a party of a share of the profits of a business or venture as compensation for his services in the enterprise does not by that fact alone constitute him a partner. In other words, in order to establish prima facie evidence that a party is a co-partner, it must appear his right to share in the profits results from the fact he is a part owner of them. *Shebley v. Quatman,* 66 Or 441, 134 P 68; *Smith v. McGowan & Sons,* 131 Or 522, 284 P 189; *First National Bank of Eugene v. Williams,* supra; *Worden v. Beals,* supra; *Elliott v. Murphy Timber Co.,* 117 Or 387, 244 P 91, 48 ALR 1043; *Preston v. SIAC,* 174 Or 553, 149 P2d 957; *Claude v. Claude,*

191 Or 308, 228 P2d 776, 230 P2d 211; *Eldridge v. Johnston*, 195 Or 379, 245 P2d 239; *Moore v. Willamette Iron & Steel Works*, 127 Or 134, 271 P 49; *Marnon v. Vaughan Motor Co., Inc.*, 184 Or 103, 194 P2d 992. As we said in *Devereaux v. Cockerline*, 179 Or 229, 170 P2d 727:

> "The weight of authority seems to be that the presumption arising from a profit sharing agreement is rebutted by a mere showing that the only consideration for the agreement was the rendition of services. * * *"

Defendant Wallace was paid a portion of the receipts of the corn picking operation on the basis of the number of tons of corn he actually hauled. He was paid only for the exact services he performed and no more. He realized a profit from the operation of his truck only if this amount thus received exceeded his expenses.

We quote from the testimony of Ralph Killinger, the plaintiff's first witness:

> "Q What you paid your hauler was an expense item, wasn't it?
> "A I just never considered it expense. I just considered the hauler's wages.
>
> "Q But it wasn't part of your profit?
> "A No.
>
> "Q In other words, as far as you were concerned that was the wages of the driver and his truck?
> "A Yes."

Ralph Killinger also testified that George Killinger & Sons calculated their profits for the corn picking operation by deducting the expenses of operation and the amount paid to Wallace for hauling. This indicates that Wallace received a portion of the gross receipts

rather than the net profits; and that the profits remaining after expenses and hauling were deducted belonged to the partnership of George Killinger & Sons. The profits derived from the operation by George Killinger & Sons and Wallace respectively were calculated independently and it is easily possible one could have suffered a loss while the other realized a gain. The amount that Wallace received was not his share of the profits as such but compensation for his services in hauling the corn.

It will be fruitful to review our past disposition of this problem of shared profits. In *Willis v. Crawford,* 38 Or 522, 63 P 985, 64 P 866, this court denied equitable relief in the nature of an accounting to the plaintiff, a lawyer, who had agreed with the defendant, another lawyer, to share fees derived from legal services rendered to an individual. Although the two attorneys occupied the same office space, they had not ordinarily acted as partners, but in the particular transaction in question they rendered the services jointly and the client paid all the expenses. We held dividing the fees did not create a partnership on the basis of shared profits.

In *Wheeler v. Lack,* 37 Or 238, 61 P 849, the plaintiff and defendant entered into an agreement to divide the brokerage commission in case either should refer to the other a customer to whom sales of property should be made. There was no provision in the agreement for the sharing of expenses or losses. We there held the plaintiff had failed to establish the existence of a joint adventure.

In *Marnon v. Vaughan Motor Co.,* 184 Or 103, 194 P2d 992, plaintiff invented a mobile lift truck and entered into an agreement with defendant whereby Vaughan Motor Co. was to produce the lift truck as-

suming all expenses of manufacture. Plaintiff set up dealerships throughout the United States to market the lift trucks and was paid eight per cent of gross sales. From this amount he paid all expenses of maintaining the dealerships. The decision held that Marnon was an agent and not a joint adventurer. Justice LUSK stated:

"He [Marnon] was not at that time, under any definition of joint adventure that we have seen or within the holding of any case to which we have been referred, a joint adventurer with Vaughan, because he did not share in the profits of the business as such, but under his agreement was entitled to his compensation of eight per cent whether there were profits or not. * * *"

## II Sharing of Losses

■ The sharing of losses when they occur is one of the major elements of a partnership in the absence of an agreement to the contrary. *McKee v. Capitol Dairies,* 164 Or 1, 99 P2d 1013; *Elliott v. Murphy Timber Co.,* 117 Or 387, 244 P 91; *Devereaux v. Cockerline,* 179 Or 229, 170 P2d 727. Viewed in isolation, the failure to share losses may not determine the status of the relationship for it is perfectly consistent with the existence of a partnership that one partner assumes all the losses. But this result ordinarily arises by express agreement. If a partnership does exist, absent agreement to the contrary, an obligation to share the losses is implied from the relationship. An agreement between partners may provide for a disproportionate sharing of the losses or even the assumption by one partner of all the losses. *Devereaux v. Cockerline,* supra.

Thus, in reviewing the activities of the parties to determine whether their conduct is that of co-partners

in a venture, whether they share the losses is a material element. If they share the losses they are in one respect functioning as a partnership; conversely, the absence of a sharing of losses is a circumstance mitigating against the existence of a partnership.

We quote again from the testimony of plaintiff's witness Ralph Killinger who swore on cross examination:

"Q Now then, Mr. Killinger, in the event Killinger and Sons, during the operation of the corn picker, lost money you recognized you wouldn't have any claim against Mr. Wallace for any part of your loss?

"A No, I wouldn't have any claim.

"Q In other words, if you lost money on your corn picker that would be too bad for you?

"A Correct."

Counsel for the plaintiff failed to alter this testimony on redirect examination.

Ralph Killinger also testified during this redirect questioning that if a farmer failed to pay him for the picking and hauling operation he did not believe he would have to pay Wallace. This is the only instance revealed by the record in which Wallace would sustain a loss because the corn picking operation sustained a loss. We do not equate this with the factor of "sharing losses" attributable as an element of partnership. It is idle to speculate on the types of losses that could arise in an operation such as this, but there certainly must be more than simply the loss from an uncollected debt.

It is not necessary for us to determine the exact status of Wallace; we are called upon only to decide whether he was a joint adventurer with George Kil-

linger & Sons. An individual, such as Wallace, could be either an employee or an independent contractor if his compensation was contingent upon collection of moneys by some one in a higher status such as the Killingers. It is too far removed from the ordinary concept of shared losses to be considered indicative of partnership.

*Smith v. McGowan & Sons,* 131 Or 522, 284 P 189, presents a similar situation. One issue in that case involved the existence of a partnership between plaintiff Smith and one Rogers. Rogers, an Oregon resident, had a commercial fishing license and a leasehold interest in some docks and fishing equipment. Smith, a commercial fisherman, was a Washington resident and could not obtain the required Oregon fishing license. Rogers and Smith entered into an agreement whereby Rogers was to allow Smith to use his license and leased property and was to receive 2 per cent of the gross receipts from sale of fish. They had an "understanding" that Rogers was not to receive his 2 per cent if there were no profits or if "the profits did not justify" the payment. The decision held there was no partnership. Rogers' compensation was contingent on there being sufficient profit from the fishing operation, while Wallace's payments were contingent only on collection of the accounts.

### III  Right to Share in Control

■ Joint control as well as an agreement to share the profits and losses is generally essential to a joint adventure or partnership. 30 Am Jur, Joint Adventure, §§ 10, 12, p. 682; *Portland Trust & Savings Bank v. Lincoln Realty Co.,* 180 Or 96, 170 P2d 568; *Drake Lumber Co. v. Paget Mortgage Co.,* 203 Or 66, 274 P2d 804. Its importance may be greatest in situations

where there is an agreement to share profits without any agreement to share losses. In such cases the right to direct and control the affairs of the venture can often distinguish those who have a proprietary interest in the profits from those whose interest is limited, such as employees, lenders, or independent contractors.

The existence of joint control in a particular relationship must be distinguished from the right of joint control. If a party has the right of joint control in the first instance, he can delegate it or surrender it in varying degrees to another party in the relationship. Patently, the right must exist before it can be delegated or surrendered. It follows then if from the inception of the relationship there is no right of management, there is none to delegate. This factor, although not controlling, mitigates against the existence of a partnership.

In this case we are faced with a situation where there is no express agreement, and we must look to the objective conduct of the parties to determine where the right of control reposed.

The record, when viewed as a whole, reveals the Killingers exerted the predominant influence in the conduct of the corn picking operation. They purchased the corn picking machine, hired the plaintiff and paid his wages, kept the books and accounts of the operation, entered into agreements with the farmers to harvest their corn, collected the charges for corn picking and hauling, deposited the receipts in the George Killinger & Sons business account, paid Wallace when he requested, and as testified by Ralph Killinger, he and his brother "were in charge of the operation."

There is scant indication that Wallace exerted any control in the enterprise. He did not enter into agreements with the farmers to harvest their corn.

He responded thus to a question posed by plaintiff's counsel:

> "Q  Did you at any time during the year 1960 go out and contact any farmers in your area and make arrangements to pick their corn with Mr. Killinger's picker and your truck and his truck?
>
> "A  I wouldn't go as far as to say I made arrangements. I might have asked a couple of farmers if Mr. Killinger could pick their corn, because if he could pick their fields I make that much more with my truck.
>
> "Q  Did you quote them a price?
>
> "A  No, it ain't up to me to quote a price."

From the testimony of the plaintiff, we see that Wallace had only a modicum of control over plaintiff. On redirect and recross examinations the plaintiff swore:

> "Q  During this operation, when you were working on this corn picker, did you ever have occasion to receive instructions on what to do from the defendant Wallace?
>
> "A  Well, any time when he was working if he seen something is wrong he would naturally would point to wherever it was, whenever he was driving along side the machine.
>
> "Q  Where he could see, and if he saw something was wrong and indicated he wanted something done, did you do it?
>
> "A  Yes.
>
> "Q  Did you take any reasonable order he gave on that job?
>
> "A  Certainly."

And on recross examination:

> "Q  Just exactly what kind of instructions you claim he gave specifically?
>
> "A  Just like the night we finished loading up, they were trying to cram everything they could

into the truck and he says, 'get up and shove it down in the corners,' which we did and he got on a bigger load."

These portions of the plaintiff's testimony indicate that Wallace, far from manifesting the attitude of an employer, acted like any cooperative fellow worker in pointing out to plaintiff when and where the machine was clogged. Wallace's instruction to "get up and shove it down in the corners" bespeaks more of a request for aid in getting a bigger load than an order from an employer. He was paid on the basis of weight and the more weight per load the more profit could be derived from a single trip.

These excerpts quoted from the record are the only evidence—if such they are—that Wallace shared or had a right to share in control of the corn picking operation. They are not evidence that defendant Wallace had a right to share in the management of the enterprise as a joint adventurer.

■ In summary we see that in order to create a joint adventure it is not enough that the parties act in concert to achieve some economic objective. The ultimate inquiry is whether the parties manifested by their conduct a desire to commingle their profits, control, and risks in achieving the objective. The case at bar does not, in our opinion, reveal such an amalgam of funds, of property, of skills, of risks, of control or of interest as would create a joint adventure. The minds of reasonable men would coalesce, we believe, in this view. The judgment of the trial court granting the motion for involuntary nonsuit is affirmed.