LOWELL H. ROBERTS v. ELWOOD DONALDSON, d.b.a. E. L. DONALDSON TRUCKING SERVICE, AND OTHERS. ED BERG AND ANOTHER, d.b.a. BERG'S TRANSFER, RESPONDENTS.

149 N. W. (2d) 401.

February 10, 1967—Nos. 39,880, 39,881, 40,090.

*Meagher, Geer, Markham & Anderson, Mary Jeanne Coyne*, and *O. C. Adamson II*, for appellant Dakota Transfer.

*King, MacGregor & Lommen*, for other appellants.

*Robins, Davis & Lyons, Roger T. Sahr*, and *Ronald A. Jacks*, for respondents Berg.

NELSON, JUSTICE.

Appeal from a judgment in favor of defendants Ed Berg and Jerome Berg, d.b.a. Berg's Transfer, against the other defendants for indemnification of any amount the Bergs should be required to pay on a judgment for plaintiff, Lowell H. Roberts, against all defendants.[1]

A somewhat detailed statement of the facts is required. Elwood Donaldson, d.b.a. E. L. Donaldson Trucking Service, is engaged in the general trucking business in Bloomer, Wisconsin. Donaldson owns several truck tractors and employs drivers, one of whom was Norman Pokorney

---

[1] Appeals were taken from this judgment, but it has been satisfied and is not attacked here.

during December 1961. Donaldson did not own any trailers, but used his tractors to haul trailers owned by others.

Jerome Berg and his father, Ed Berg, d.b.a. Berg's Transfer, operate a trucking service in Ladysmith, Wisconsin, about 40 miles northeast of Bloomer. The Bergs own and operate both tractors and trailers. One of their trailers in December 1961 was a Kentucky flatbed trailer which had rear tandem axles with dual wheels, thus having eight wheels at the rear.

On or about December 19, 1961, the Bergs notified Donaldson that they had contracted to haul a load of lumber from Medford, Wisconsin, to Chicago. It was agreed that Donaldson would furnish a tractor and driver, that Berg would furnish a trailer, and that they would share in the proceeds of the contract. Accordingly, Pokorney drove a Donaldson tractor to Ladysmith, hitched on the Berg Kentucky flatbed trailer, then picked up the load of lumber at Medford, and delivered it in Chicago. After the trip Pokorney returned the trailer to the Bergs at Ladysmith. A week later a second load of lumber was hauled pursuant to the same arrangement; but before the trailer was returned to the Bergs, they contracted for a third trip and suggested that for convenience in handling future hauling the Kentucky flatbed trailer be kept at Donaldson's lot in Bloomer. Thus, for some six weeks prior to the accident involved in the instant case, the Berg trailer remained in the possession of Donaldson at Bloomer, and five or six trips were made under the arrangement between the Bergs and Donaldson. Donaldson did not use the Berg trailer on any other occasion.

From the outset of the arrangement, the Bergs made it clear that they retained the right to arrange back hauls, and it was understood that they and Donaldson should share in the proceeds of such hauls in the same proportions as on the outgoing trips. It was also agreed that if the Bergs did not provide a load for the return trip, Donaldson was free to attempt to pick up a back haul. On the one or two occasions that the Bergs did not have a load for the return trip, Donaldson's driver entered into a trip lease for a back haul. Donaldson testified that by agreement the Bergs were to receive as compensation for the use of the flatbed trailer 15 percent of the revenue produced by back hauls contracted by

Donaldson. Jerome Berg stated that he and Donaldson had never discussed whether or not the Bergs should receive a share of the proceeds realized on back hauls arranged by Donaldson, but that such an arrangement is customary in the trucking business and the Bergs would have accepted a percentage if it were given.

On January 26, 1962, Donaldson's driver, Pokorney, drove one of Donaldson's tractors, a tandem-axle International tractor which had brakes on the rear tandem but none on the front axle, and the Berg flatbed trailer to Chicago with a load of lumber. The Bergs had not arranged any back haul for the trip, so, after delivering the lumber, Pokorney entered into a trip lease for Donaldson with Dakota Transfer and Storage Company to transport steel pipe from Gary, Indiana, to Minneapolis. The trip lease entered into was in the form prescribed by I. C. C. regulation and provided that Donaldson leased the tractor and the Kentucky flatbed trailer to Dakota from 5 p. m. January 26 to 5 p. m. January 27, 1962. Under the terms of that lease the tractor and trailer were to be used to transport property from Chicago to Minneapolis and the only route scheduled to be followed on the trip was on Highway No. 14 from Chicago to LaCrosse, Wisconsin, and on Highway No. 61 beyond that. It was agreed that Dakota should have exclusive possession, control, and use of the leased equipment and that the equipment had been inspected and was found to comply with certain motor carrier safety regulations. The lease provided that Donaldson should receive 72½ percent of the revenue derived from the use of the equipment and the services of the driver.

Early Saturday morning, January 27, 1962, Pokorney started toward Minneapolis with a 45,620-pound load of steel pipe on the Berg flatbed trailer. As he neared Janesville, Wisconsin, Pokorney began to hear an unusual noise in the rear of the tractor. Pokorney then left the route prescribed by the lease and, instead of proceeding to Minneapolis, drove to Bloomer, Wisconsin, arriving late Saturday afternoon. Neither Donaldson nor Pokorney informed Dakota that the tractor-trailer unit and its cargo had been driven to Bloomer. Shortly after Pokorney left Bloomer on the following Monday morning, the tractor broke down. On Monday afternoon Donaldson advised Dakota of the whereabouts of the equip-

ment and the load of steel pipe. Dakota asked Donaldson to either repair the broken-down tractor or to substitute another so that the load could be delivered. Donaldson told Pokorney to hitch the loaded Berg flatbed trailer to a single-axle International tractor, and on Tuesday morning, January 30, 1962, Pokorney again set out for Minneapolis.

Pokorney traveled in a westerly direction on Highway No. 12 to its intersection with Highway No. 100, where he turned onto Highway No. 100. He denied seeing any signs along Highway No. 12 directing drivers with heavy loads to avoid a steep hill on Highway No. 100, 3½ miles south of the intersection, and to proceed instead on Highway No. 12. Pokorney admitted that after he had turned onto Highway No. 100 he saw a similar sign, but stated that he could find no place in which to turn his rig around. Approaching the top of a hill, Pokorney saw a sign reading "STEEP HILL AHEAD." He shifted into third gear low range at the crest of the hill and started down the hill at about 5 miles per hour.

The single-axle tractor that he was then driving had one rear axle with dual wheels, thus having four rear wheels, and had brakes on both front and rear axles. The truck had a five-speed transmission with two ranges, high and low in each gear or a total of ten different gear and range settings.

Part way down the hill the road turns toward the left and beyond that turn the descent is steeper. On the steeper portion of the hill the rig began to pick up speed and Pokorney applied the air brakes to slow the tractor-trailer unit. At the foot of the hill Highway No. 100 meets Highway No. 61 at a T-intersection. Traffic on Highway No. 100 is required to stop before entering Highway No. 61. There is a stop sign at the bottom of the hill and at the top of the hill there is a sign reading, "HILL USE LOW GEAR." At the crest of the hill Pokorney had shifted into low gear, but not the lowest. On seeing the stop sign and the intersection of the highways, Pokorney attempted to stop the rig by pumping the foot pedal which operates the brakes on the tractor and trailer. He also set the trailer brakes by manipulating a separate control. The brakes failed to check the speed of the rig and, realizing that he could not control the tractor-trailer unit, Pokorney jumped from the cab. Just before Pokorney jumped from the truck a warning buzzer had signaled that the air pres-

sure in the compressor tank was low. The truck was equipped with a device designed to operate the trailer brakes automatically when the air pressure falls below a certain point.

The tractor and trailer went through the intersection, struck plaintiff's automobile, and rolled down an embankment on the west side of Highway No. 61. Plaintiff brought this action against the Bergs, Donaldson, Pokorney, and Dakota to recover for the personal injuries he sustained in the accident. On the issue of liability the court directed a verdict in his favor against all defendants, the parties stipulating thereafter to the amount of his damages. The court then made findings that at the time of the accident Pokorney was operating the rig for the benefit of Donaldson and Dakota; that Pokorney negligently disregarded highway signs; that he, Donaldson, and Dakota negligently failed to discover the defective condition of the Berg trailer; that Pokorney and Donaldson negligently used a tractor of inadequate capacity to haul the loaded trailer; and that the negligence of Pokorney, Donaldson, and Dakota constituted efficient superseding causes of the accident which relieved the Bergs from liability for their negligence in furnishing the defective trailer. The court concluded that, although the Bergs were liable to plaintiff under the Safety Responsibility Act, they were entitled to indemnity from the other defendants. Donaldson, Pokorney, and Dakota appeal from the judgment in favor of the Bergs.

Further facts established by the record are as follows: The single-axle tractor which Donaldson substituted for the trip from Bloomer to Minneapolis weighed about 8,000 pounds, while the tandem-axle tractor which had broken down weighed about 15,000 pounds. There was testimony that the manufacturer's recommended gross maximum weight for the operation of a single-axle tractor of the type involved in the collision was 48,000 pounds. There was some testimony that the carrying and braking capacity of such equipment is a good deal greater than the recommended capacity and that it is generally recognized by manufacturers that the users of tractors and trailers customarily exceed the recommended capacities. The actual gross combined weight was between 61,000 and 62,000 pounds. There was no testimony that the load transported by the tractor-trailer exceeded the legal weight limitations.

The Bergs had sold the Kentucky flatbed trailer, purchased in 1952, during the year 1954 and had repossessed it in 1959. At the time of repossession it had been modified in several respects. The Bergs had made no inspection of it after repossessing it; had not made any repairs on it; and had used it occasionally for their own drivers, some of whom had complained that the brakes stuck. Over the period of 6 weeks Donaldson has used it to haul lumber to Chicago, there do not appear to have been any Donaldson complaints; but Donaldson did present testimony that subsequent to the accident a Berg employee had admitted that there were no brakes on some of the trailer wheels. Donaldson presented no testimony concerning information about the brakes or wheels of the trailer which he may have acquired through inspection of the trailer at the Bloomer garage which checked and repaired his equipment.

At the trial Adolph Lee, a professor of mechanical engineering, testified in behalf of plaintiff that the brakes on the Berg trailer were faulty at the time of the accident and that they had been defective for a considerable period of time. Both Donaldson and Pokorney, who admitted either having inspected the flatbed trailer during its use or having had it inspected, testified that they had no actual knowledge prior to the accident of the alleged defective condition of the brakes on the trailer; nor was there any testimony that Dakota had actual knowledge of the defective condition of the trailer even after its employees inspected it to comply with I. C. C. requirements prior to Pokorney's departure from Chicago on the trip to Minneapolis.

The record indicates also that at the trial Jerome Berg testified that some time before the accident Donaldson had informed Berg that two brake shoes were missing from the trailer; that that was Berg's first knowledge of the condition; and that he told Donaldson to have the brakes repaired and charge the cost to Berg. Berg further stated that after the accident Donaldson had asked Berg to "cover for him" with the I. C. C. representative who was investigating the accident and that Berg had informed his counsel of this before the taking of his discovery deposition. In his deposition, however, Berg had stated that there was no specific agreement between the parties for repairing the trailer and that the first time Berg knew about defective brakes on the trailer was after

the accident. There was no mention in the deposition of "covering for" Donaldson. The Bergs' attorney denied that Jerome Berg had disclosed to him any conversation with Donaldson prior to the accident or any request by Donaldson concerning the investigation of the accident.

■ The legal issues presented by this appeal are (1) whether the relationship between the Bergs and Donaldson was one of joint venture so as to make the Bergs vicariously responsible for the negligence of the driver, Pokorney; (2) whether a trial court may decide the question of indemnity as a matter of law when the underlying facts are so clear that they warrant a directed verdict against all defendants and are the same facts which bear on the question of indemnity; (3) whether the facts in this case establish that the admitted negligence of Donaldson, Pokorney, and Dakota constituted efficient intervening and superseding causes insulating the Bergs from active responsibility to plaintiff and warranting the finding of indemnity.

No definite rule has been formulated for indemnifying in joint venture relationships in all cases. Each case depends upon its own peculiar facts.

Mr. Justice Matson in Rehnberg v. Minnesota Homes, Inc. 236 Minn. 230, 235, 52 N. W. (2d) 454, 457, said that it is recognized, however, that an enterprise does not constitute a joint venture unless each of the following four elements is present:

"(a) *Contribution*—the parties must *combine their money, property,* time, or skill in some common undertaking, but the contribution of each need not be equal or of the same nature.

"(b) *Joint proprietorship and control*—there must be a proprietary interest and *right of mutual control* over the subject matter of the property engaged therein.

"(c) *Sharing of profits but not necessarily of losses*—there must be an express or implied agreement *for the sharing of profits (aside from profits received in payment of wages as an employe)* but not necessarily of the losses.

"(d) *Contract*—there must be a contract, whether express or implied, showing that a joint adventure was in fact entered into." (Italics supplied in part.)

Other courts have stressed one or another of these elements. For instance, in the Oregon case of Hayes v. Killinger, 235 Ore. 465, 478, 385 P. (2d) 747, 753, it was held:

"* * * [T]he right to direct and control the affairs of the venture can often distinguish those who have a proprietary interest in the profits from those whose interest is limited, such as *employees, lenders,* or *independent contractors.*" (Italics supplied.)

According to the Texas Court of Civil Appeals, in the case of Johnson v. Murray Co. Inc. 90 S. W. (2d) 920, the authorities uniformly hold that even where the rental or consideration for a lease is based upon compensation out of the net profits, or on a percentage of the sales of a leased business, no joint enterprise is created, but that only the relation of landlord and tenant exists. See, Annotation, 138 A. L. R. 968, 988.

What was said in Rehnberg v. Minnesota Homes, Inc. 236 Minn. 230, 236, 52 N. W. (2d) 454, 457, appears to be applicable here:

"* * * [T]he indispensable element of a *contract* for the formation of a joint adventure is also absent."

For other Minnesota cases in which the facts were held not to establish a joint venture, see Peterson v. Norris, 193 Minn. 400, 258 N. W. 729; Hindahl v. American Loan Soc. 180 Minn. 447, 231 N. W. 408.

The instant case involves a trip lease entered into with Dakota by Donaldson's driver, Pokorney, for Donaldson, and there is no evidence that the Bergs had a right to share in the management of the enterprise as a joint venturer. In this case we are faced with a situation where there was no express agreement with the Bergs whereby Donaldson was privileged to arrange for a back haul on his own, and we must therefore look to the objective conduct of the parties to determine where the right of control reposed while the arrangements undertaken by the actual parties to the trip lease were being carried out. The Bergs had no part in this trip lease entered into between Donaldson and Dakota. If the Bergs had no back haul, it was Donaldson's privilege to acquire one without participation by the Bergs.

As was said in Hayes v. Killinger, 235 Ore. 465, 478, 385 P. (2d) 747, 753:

"The existence of joint control in a particular relationship must be distinguished from the right of joint control. If a party has the right of joint control in the first instance, he can delegate it or surrender it in varying degrees to another party in the relationship. Patently, the right must exist before it can be delegated or surrendered. It follows then if from the inception of the relationship there is no right of management, there is none to delegate."

The case most in point with respect both to facts and law is Pinkowski v. Coglay (7 Cir.) 347 F. (2d) 411. In the Pinkowski case it was alleged that Mohawk, the owner of the truck-tractor which was used by Arnel to ship fish, was a party to a joint venture. The driver of the truck, Keefe, leased the truck to Arnel in behalf of Mohawk. The court held as a matter of law that Keefe, Arnel, and Mohawk were not engaged in a joint venture. The reason for the court's holding appears from the following (347 F. [2d] 413):

"* * * Mohawk had no control over or connection with the delivery of fish: the fish were loaded onto the truck trailer in Boston by Arnel; the bills of lading for the fish were in the name of Arnel; Keefe filled out logs which he gave to Arnel; Arnel's receipts were signed by consignees for the fish; Keefe made collections on behalf of Arnel; and the destination of the tractor-trailer unit and the date and time of arrival were determined by Arnel."

The facts in the instant case do not indicate the existence of "joint proprietorship and control." It is true that the Bergs had the right to select the back haul initially. If they did not choose to contract for the back haul, then the right passed to Donaldson. Donaldson's driver entered into the trip lease, which provided that Donaldson was to receive 72½ percent of the proceeds of the delivery. It was Donaldson who determined the route with Dakota. It was Donaldson who was contacted when the tractor broke down, and it was Donaldson who determined what type of replacement tractor should be used for the remainder of the haul. The testimony is clear that the Bergs had nothing to say about

the way the back haul would or should be handled from the time that they determined that they were not going to arrange for a back haul of their own and the right to do so passed to Donaldson. Under this state of facts the only conclusion that can be reached is that the Bergs occupied the position of either a lender, a lessor, or an independent contractor and not that of a joint venturer.

The trial court correctly determined that the issue of indemnity should be decided by the court since the same facts which required a directed verdict on the issue of liability are those bearing on the issue of indemnity.

■ In Kroeger v. Lee, 270 Minn. 75, 78, 132 N. W. (2d) 727, 729, this court said that for a cause to be intervening four elements are necessary:

"* * * (1) Its harmful effects must have occurred after the original negligence; (2) it must not have been brought about by the original negligence; (3) it must actively work to bring about a result which would not otherwise have followed from the original negligence; and (4) it must not have been reasonably foreseeable by the original wrongdoer."

In Strobel v. Chicago, R. I. & P. R. Co. 255 Minn. 201, 208, 96 N. W. (2d) 195, 201, this court said:

"* * * Only when there might be a reasonable difference of opinion regarding the foreseeability of the intervening act should the question of intervening cause be submitted to the jury."

There can be little question but that this accident would not have occurred if Pokorney had not completely disregarded the I. C. C. instructions to follow Highway No. 14 to LaCrosse and No. 61 to Minneapolis. Furthermore, had Pokorney not completely disregarded the signs on Highway No. 12 directing truckdrivers to avoid using Highway No. 100 in approaching Highway No. 61 because of the steep hill leading to their junction, it is only reasonable to assume that the accident would not have occurred. It is difficult to see how the Bergs could have reasonably foreseen such an act of negligence on the part of the driver-employee of Donaldson and Dakota. Similarly, it is difficult to see how the Bergs could have reasonably foreseen that Donaldson would use a tractor which

was insufficient for the load after the breakdown of the first tractor occurred. The record makes it clear that the recommended gross maximum weight for the cab with which Donaldson replaced the one which had broken down was 48,000 pounds and that the actual gross combined weight at the time the accident occurred was greatly in excess of that poundage.

Furthermore, the testimony of Professor Lee, the expert whom plaintiff called to testify, indicates that the condition of the brakes on the trailer could be detected by an experienced mechanic with a minimum of difficulty. Under such circumstances it would seem reasonable that Dakota's examination of the rig pursuant to I. C. C. regulations should have disclosed the defective condition. Its negligence in its failure to inspect with reasonable care, and thus to discover the defective condition, was also not foreseeable.

The trial court properly found that the gross negligence of Pokorney in entirely disregarding the route scheduled by the I. C. C. and in failing to observe the signs on Highway No. 12; his and Donaldson's negligence in the use of a cab which was insufficient for the load being carried; and the negligence of Pokorney, Donaldson, and Dakota with respect to inspection were efficient intervening causes operating to insulate the Bergs from responsibility for the accident. The determination made by the court has ample support in the record.

Affirmed.

MR. JUSTICE PETERSON, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.