Argued and submitted January 20, affirmed April 26, 1995

John KUHL
and Sandra Kuhl,
*Respondents,*

*v.*

Les GARNER
and Debra Garner,
*Appellants.*

(91-755; CA A80895)

894 P2d 525

George W. Kelly argued the cause and filed the briefs for appellants.

David D. Powell argued the cause for respondents. With him on the brief was Sullivan & Powell.

Before Deits, Presiding Judge, and Haselton, Judge, and Buttler, Senior Judge.*

BUTTLER, S. J.

---

* Buttler, S. J., *vice* Richardson, C. J.

## BUTTLER, S. J.

Plaintiffs, husband and wife, filed this action for an accounting of a partnership that they claim existed between them and defendants, for its dissolution and for the distribution of its assets. Defendants appeal from a judgment for plaintiffs determining that there was a partnership and ordering defendants to render an accounting, following which the partnership is to be dissolved and the assets divided equally between plaintiffs and defendants.[1] Defendants contend that there was no partnership, but, even if there was one, its terms were different from what plaintiffs claim. Although we review *de novo*, ORS 19.125(3), we defer to the trial court's findings that turn on the credibility of witnesses. *Oshatz v. Goltz*, 55 Or App 173, 637 P2d 628 (1981).

Plaintiffs became acquainted with defendant Les Garner[2] in 1978 when he employed plaintiff Sandra Kuhl in his real estate brokerage firm near Fresno, California. Sandra became impressed with and respected defendant's skills as an appraiser, real estate broker and business man. Plaintiff John Kuhl was a machinist. In 1983, plaintiffs moved to Milton-Freewater where they operated a machine shop in partnership with another couple. By 1988, plaintiffs concluded that that business could not support two families and decided to sell their interest to their partners. They began looking for other opportunities and became interested in investing in real estate in Baker City that they could fix up and rent.

Because of her respect for defendant's business acumen, Sandra called him and explained what she and John were considering and asked his advice. The conversation aroused defendant's interest, and he said he would come up to discuss the prospects with them and look at some properties. They met in Milton-Freewater on July 3, 1988, and the next day they went to Baker City to look at some properties. Together, they located three promising properties, two of which were not habitable but were developable; that is, they

---

[1] Judgment was entered pursuant to ORCP 67 B.

[2] Defendants are Les Garner and his wife, Debra. Because Debra did not testify, although she participated in the first discussions that occurred between plaintiffs and Les in July 1988, we will refer to Les as defendant, and to both as defendants.

needed substantial repair and renovation. Defendant took over the negotiations, and told the real estate agent that they would take title in the name of "K and G Properties (John and Sandra Kuhl and Les and Debra Garner)." Defendant provided the money for the down payments.

That is the way it was done with respect to those three properties, and the parties agree that they had formed a partnership at that time. However, they disagree as to the terms of the partnership. They agree that defendants were to put up the money for the acquisition of properties and that plaintiffs were to do whatever work was necessary to make the properties rentable, maintain them, obtain tenants, collect the rents and generally run the partnership locally. Defendant would remain in California and provide his expertise and money to acquire additional properties. It was anticipated that the rents would service the debt. They also agree that plaintiffs would not be paid for their work and that the properties would be sold in 10 years, which is when defendant planned to retire. Plaintiffs contend that, at that time, they and defendants would each receive one-half of the proceeds after payment of the indebtedness; until that time, no profits were to be distributed.

Defendant, however, testified that plaintiffs were to be credited with $6 per hour for John's work, and that until his credit equalled the amount of money that defendants had invested, plaintiffs would not be entitled to a share of any profits realized before the sale of the properties at the end of 10 years. However, he did not clearly contradict plaintiffs' testimony that the net sales proceeds were to be split equally after liquidation of the properties when the partnership terminated, without attempting to balance defendants' cash investment against hours worked by plaintiffs. Defendant did not say that John was to keep a record of his time so that a determination could be made as to the percentage of the net proceeds, if any, to which plaintiffs would be entitled when the partnership was dissolved; his testimony was limited to a division of rents.

Although John did keep a record of some of his time for about 10 months, he said that he did not think it important, and he never submitted the records to defendant, and defendant never asked whether John was keeping time

records until he requested them in this lawsuit. Among other things, defendant referred only to John's time, whereas Sandra also performed services for the partnership by either finding, or participating in finding, properties for the partnership and, in at least one instance, arranging a loan to the partnership. Both plaintiffs testified that the time that they devoted to partnership matters was not relevant; their contribution was to perform all of the management functions relating to the properties in Baker City while defendant remained in California and that no dollar value was ever placed on those services.

The parties had anticipated that John would obtain other employment, but he was unable to find a job utilizing his training as a machinist. His effort to establish a business as a process server and investigator met with little success. Much of his time was devoted initially to the restoration and repair of the partnership properties and later to maintaining them, obtaining tenants, collecting rents, making deposits, paying bills and making purchases relating to the partnership properties.

When plaintiffs moved from Milton-Freewater to Baker City, they had substantial personal debts. Although Sandra had obtained outside employment at the minimum wage in Baker City, their financial position worsened. In April of 1989, they consulted an attorney about bankruptcy. They were advised that, in order to protect defendant, they should convey their interest in the three partnership properties to defendants, wait three months and then file their bankruptcy petition. Although the deeds were not prepared and delivered to defendants until June, plaintiffs advised defendants of the situation in May 1989, and delivered the partnership records to him. At that time, plaintiffs considered the first partnership to have ended. Their bankruptcy petition was filed in September 1989.

Between May and September 1989, defendant purchased five other developable properties in Baker City, many of which plaintiffs had found for him. He told John that he would pay him $6 per hour to continue the services that he had been performing before. Given their financial situation, the offer was accepted to help them get by for the time being. During that fall, defendant and plaintiffs spent three days

looking at more developable properties in Baker City. According to plaintiffs, in October 1989, while the purchase of four of those properties was pending, defendant told them that their bankruptcy meant nothing to him, and that they would continue their partnership on the same terms as before, except that he would pay John $6 per hour out of partnership money with the understanding that he would not request compensation for all of the time that he worked and they would not bill for time spent looking for properties. He said that their time was "going to go towards" their half, regardless of the time they spent. Plaintiffs agreed and claim that the partnership was recreated at that time.

Two more properties were acquired in 1990, bringing the total properties in what plaintiffs claim was the recreated partnership to 14, comprised of 58 living units, all of which John managed, repaired and maintained. For the year 1989, John reported gross receipts from defendant of $485 and for 1990 receipts of $7,689, both taken from the IRS Forms 1099 sent to him by defendant. Defendant points out, and plaintiffs concede, that the latter amount did not include the rental value of the partnership property in which plaintiffs were living, which was deducted from the amounts paid to John. Apparently, their rent was based on the amount of the mortgage payment plus the real property taxes on that property, a total of $375. If that amount had not been deducted from the payments to John, his gross income for 1990 would have been approximately $12,189. However, according to John, he worked between 60 and 70 hours per week, not including calls in the middle of the night; if he had requested payment for all of those hours at $6 per hour, his compensation would have been between $18,720 and $21,840 for 1990.

A real estate agent in Baker City testified that her agency charges one-half of the first month's rent for procuring tenants, plus a management fee of $35 per month per rental unit for obtaining tenants and executing rental agreements. That would come to approximately $24,000 per year for 58 units, not including renovation, repairs or maintenance, for which there would be additional charges. However, there would be some reduction in the rate for multiple family units. The witness added that her company would not be enthusiastic about accepting management responsibilities at

$35 per unit for the properties in question, because of their condition.

Plaintiffs testified that, after the partnership had been recreated in October 1989, defendant discussed with them the need to refurbish or repair a number of the properties that would require a substantial amount of money — $25,000 to $30,000. Sandra had a friend, Schreffler, who had money to lend; she asked defendant if he would be interested in her pursuing that source. He said that he was, and she approached Schreffler, who was willing to loan $40,000 to be secured by a second deed of trust on two of the original partnership properties. Sandra had told Schreffler, after the first three properties were deeded to defendant, that defendant had assured plaintiffs that the partnership would continue as before. Schreffler understood that the loan was being made in defendants' name, because plaintiffs were in bankruptcy and title to the properties was in defendants' names. The loan was made without Schreffler's having met defendant, and Sandra received no compensation for brokering the loan because she thought that she was doing that for the partnership. In fact, the loan proceeds were not used as intended, but were used by defendant for his own purposes, including a new home that he was building in California. When plaintiffs found that out, defendant agreed that they "expressed disappointment" that the loan proceeds were not applied as intended.

Schreffler did not meet defendant until the summer of 1990 when he and plaintiffs met defendant for breakfast in Baker City. Schreffler testified that defendant stated that he felt lucky having plaintiffs as his partners, that he put up the money and they did all of the work; that it was like a vacation for him when he came to Baker City. Defendant denied that the subject was discussed.

The owner of a secondhand store in Baker City testified that he recalled meeting with John and defendant in late September or October 1989 when they came in to set up an account. They told him that they were partners; defendant put up the money and plaintiffs did all of the work necessary to manage and care for the properties. They said that they would retire in 10 years. They bought a used refrigerator on

that occasion. Defendant recalled the occasion, but did not recall that discussion.

The insurance agent who had written the policy on the original properties naming plaintiffs and defendants as the insureds, testified that when the policy came up for renewal in November 1989, he met with defendant and John, and perhaps Sandra. During that meeting, the parties said that they had a partnership and that he understood that defendant handled the financing and that plaintiffs took care of improvements and managed the rentals. Defendant denies that such a conversation occurred. The renewal policy named all four parties as insureds. The insurance agent testified that some time later, he opened another file for defendants relating to two other properties, and a policy was issued naming only defendants as the insureds. He testified that, based on discussions (he was not sure with whom), the reason that was done was because of plaintiffs' bankruptcy.

In February 1990 and again in the fall of that year, plaintiffs asked defendant whether they could start putting their names on the title to the properties that had been purchased by the partnership. In response to their first request, he said that he could not do it at that time because of the financing arrangements and also for tax reasons, but that he would do it later. Defendant denies that that conversation took place. In response to the second request, defendant gave a different explanation. However, about a month after the first request, plaintiffs asked defendant for an accounting of the properties; defendant complied. His explanation at trial was that he always let anyone who worked for him "know what's happening to me." Defendant did not deny the existence of a partnership in response to any of those requests.

In November 1990, defendant bought three motels in Baker City, taking title in his name alone, rather than in his and his wife's name; the properties claimed to be partnership property were in both defendants' names. Plaintiffs do not claim that the motels are in the partnership. Sandra had acquired a real estate license and represented the seller; she received part of the commission. Sandra testified that defendant said that the motels were part of a tax-free exchange for property that he owned in his name in California that he hoped would be an inheritance for his children by his first

marriage. Sandra also testified that motels were not the kind of properties contemplated by the partnership. Defendant did not refute Sandra's testimony. Notwithstanding the fact that the motels were not partnership property, defendant asked John to help in their management. Because of their friendship, John agreed; thereafter, he was paid $7 per hour.

In early 1990, defendant brought his son and the son's girlfriend to Baker City. He helped them move into one of the rental properties that plaintiffs claim to be a partnership asset. They were paid $1600 per month and were supposed to help plaintiffs in the management of the properties, but did not do so. Plaintiffs did not know the source of the payments, but thought that they were paid from partnership assets. Defendant did not explain how he paid them; therefore, a reasonable inference is that they were paid from partnership funds. There is no evidence that his son paid rent.

The rental agreement forms used for the claimed partnership properties were chosen by John. Defendant wanted to add two pages containing provisions that he used in California, but John did not consider them to be appropriate. John prevailed, and all of the leases were signed by John as lessor, including those that were signed during the period between the end of the first partnership and its recreation. Defendant denied that he had seen any of the signed leases. From the beginning, trade accounts with suppliers in Baker City were in the name of the partnership and remained that way until July 1991 when defendant terminated the parties' relationship. During the original partnership, the statements were sent to plaintiffs, who paid them from the partnership bank account; after plaintiffs' bankruptcy, the statements were sent to defendant for payment out of a separate account. Although defendant is an experienced and successful businessman, he testified that he did not attempt to change the name on the trade accounts, because he didn't think that it meant anything. The partnership name had not been registered.

No partnership tax returns were filed, even for the year 1988 when defendant conceded that there was a partnership. However, both parties claimed one-half of the depreciation of the property for that year on the basis of information

provided by defendant. After that, defendant claimed all of the depreciation.

In the summer of 1991, defendant made a surprise visit to Baker City, which he had never done before. He stayed with plaintiffs and, before he left, he told plaintiffs that his wife "didn't want him in Baker any more" and asked them if they would like to buy his interest out of the rentals. They said that they would. He then said that he would get some figures together and they would talk about it later. Defendant called them about a month later and gave them his valuations of the properties, which plaintiffs were willing to accept because of his expertise. The offer that he proposed was quite complicated and plaintiffs said they would get back to him.

When plaintiffs reviewed defendant's offer, it was apparent that he had ignored their interest in the properties. They called him back and suggested that they split the properties. They would take five and he would take nine, an approximate equal division in terms of value. Defendant said that he would have to think about it. The next communication was a letter to plaintiffs from defendants' attorney telling them that their "property management services previously performed for (defendants) are no longer required" and that their "contractual and agency relationships" with defendants were terminated. They called defendant and asked him, "What does this mean?" According to plaintiffs, defendant sounded nervous and said, "It's over, we're through." When they said that it wasn't fair, he said that they had not lived up to their end of the bargain; therefore, it was over. He was standing by his decision. After consulting their lawyer, plaintiffs brought this action. Plaintiffs moved back to California.

■     Defendants' first assignment of error is that the trial court erred in finding that there was a partnership between the parties.[3] They argue that plaintiffs' evidence is not believable, because the "paper record" shows that the partnership was never recreated. Defendants rely on this evidence: (1) Earnest money agreements for properties purchased after the claimed recreation of the partnership, and the titles, were

---

[3] An agreement that has for its purpose the purchase, improvement and sale of real estate for profit is not within the operation of the Statute of Frauds. *Harestad v. Weitzel*, 272 Or 199, 208, 538 P2d 522 (1975).

in defendants' names. However, plaintiffs testified that on two occasions defendant assured them that the record titles would be changed "later." (2) Plaintiffs' 1989 and 1990 income tax returns did not indicate their interest in real property, whereas defendants took all of the depreciation on the properties on their tax returns for those years and only half of the depreciation for 1988; (3) Plaintiffs applied for a renter's refund from the state in 1989 and 1990 and reported that they owned no real property. Plaintiffs' explanation of points (2) and (3) is that, after their bankruptcy, the record title to all of the properties was in defendants' names, as a result of which they did not think that they "owned" any of the properties, although they believed that they had an interest in the partnership. (4) Insurance on the properties, which had originally been in the names of all four parties, was changed to name defendants as the insured. Actually, the first renewal named all four as insureds; according to the agent, the change was made after some discussion of plaintiffs' bankruptcy. (5) Plaintiffs did not amend their bankruptcy petition after they claimed that the partnership, owning 12 properties, had been recreated before their debts were discharged. Plaintiffs testified that they believed that assets acquired after the petition was filed were irrelevant. (6) A contract for federal section 8 housing relating to one of the rentals was signed by John. The contract lists him as "manager" and defendant as "owner." That document was not prepared by John; it was sent to him for his signature, and its context indicates that "owner" refers to the record owner. John was aware that he was not the record owner.

■■  Defendants also contend that the arrangement had none of the earmarks of a partnership. First, they say that plaintiffs have not made themselves liable for partnership losses, because all loans, mortgages and credit accounts were "the sole obligation of defendants." That puts the cart before the horse. A partnership is "an association of two or more persons to carry on as co-owners a business for profit." ORS 68.110. If there is a partnership, then all partners must contribute toward the losses, subject to any agreement between them. ORS 68.310(1).[4] Partners may agree on a

---

[4] ORS 68.310 provides:

"The rights and duties of the partners in relation to the partnership shall be

disproportionate sharing of losses or that one partner assumes all losses. *Hayes v. Killinger*, 235 Or 465, 475, 385 P2d 747 (1963). It is not necessary that title to real property be in the name of the partnership or in the name of all of the partners; it can be in the name of one or more of the partners. ORS 68.220(3) and (4);[5] *Davis v. Tadevic*, 73 Or App 587, 590, 699 P2d 1140 (1985). The transfer of record title from one partner to another does not necessarily affect the beneficial ownership in the property. *Shinn v. Vaughn*, 83 Or App 251, 255, 730 P2d 1290 (1986). Further, all partners are jointly liable for the debts and obligations of the partnership, ORS 68.270,[6] and must "render on demand true and full information of all things affecting the partnership to any partner * * *." ORS 68.330. That defendant gave plaintiffs an accounting of the claimed partnership when they requested one strongly suggests that he recognized that they were partners.

Although defendants concede that there was a partnership before plaintiffs deeded the first three partnership

---

determined, subject to any agreement between them, by the following rules:

"(1) Each partner shall be repaid the contributions of the partner, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the share in the profits of the partner."

[5] ORS 68.220 provides in part:

"(3) Where title to real property is in the name of one or more but not all the partners, and the record does not disclose the right of the partnership, the partners in whose name the title stands may convey title to such property, but the partnership may recover such property if the partners' act does not bind the partnership under the provisions of ORS 68.210(1), unless the purchaser or the assignee of the purchaser, is a holder for value, without knowledge.

"(4) Where the title to real property is in the name of one or more or all the partners, or in a third person in trust for the partnership, a conveyance executed by a partner in the partnership name, or in the name of the partner, passes the equitable interest of the partnership, provided the act is one within the authority of the partner under the provisions of ORS 68.210(1)."

[6] ORS 68.270 provides:

"All partners are liable:

"(1) Jointly and severally for everything chargeable to the partnership under ORS 68.250 and 68.260.

"(2) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract."

properties to them, they argue that that was different because plaintiffs were equally liable on the loans. With respect to the loans on the first three properties, plaintiffs remained liable[7] and, as indicated above, they would be liable on those and the others if the partnership was recreated, as plaintiffs contend. Defendants also contend that the situation was different after the first partnership ended, because they paid John wages and felt free to terminate plaintiffs' employment. However, defendant did not report the payments to John on IRS Form W-2 for the reporting of wages; he reported them on IRS Form 1099 for the reporting of payments other than wages. That plaintiffs paid rent for the house owned by the partnership is consistent with ORS 68.340; if they had used the property without defendant's consent, they would have been obligated to account to the partnership. Here, defendant consented to their occupying the house and paying the partnership for their use of it. If defendant "felt free to terminate plaintiffs' employment," that was not communicated to plaintiffs and was contrary to plaintiffs' understanding of the parties' agreement and to defendants' having rendered an accounting relating to all of the properties to them when they requested one.

In short, if there was a partnership with respect to the first three properties purchased (and defendants concede that there was), that partnership was recreated if plaintiffs' evidence is believed. Based on our review of the record, and giving due deference to the trial court's determination of credibility, we agree with its conclusion that the partnership was recreated after plaintiffs filed their petition in bankruptcy.

Defendants' second assignment is that, even if there was a recreated partnership, the trial court erred in finding that the terms were as plaintiffs claimed. They agree that the terms of the recreated partnership would be the same as they were in the original partnership, except that plaintiffs were paid enough to permit them to survive following their bankruptcy. Accordingly, they focus on the terms of the first partnership, about which the parties disagree.

---

[7] The record does not show whether plaintiffs' obligations on those three obligations were discharged in bankruptcy.

Essentially, defendants' argument is that their version of the terms of the partnership makes more sense than does plaintiffs' and is more believable. They point out that, although plaintiffs testified that their actual time devoted to the enterprise was not important and that John kept time records for only a short period of time, his records produced at trial indicate that he kept at least a partial record during the original partnership. However, plaintiffs testified that there was no monetary value put on their time and that John kept some time records for no particular reason, other than to see how his time would compare to defendants' monetary contribution when the partnership terminated. The time records were not submitted to defendants, and defendants did not ask for them, until discovery was sought in this lawsuit.

Plaintiffs' testimony was that no profits were to be distributed to the partners until dissolution at the end of 10 years; if the rents exceeded the amounts necessary to service the debt, the excess was to be applied on the debts. The theory of the partnership was that plaintiffs would take care of everything in Baker City relating to the low-income housing enterprise while defendant took care of his business 1,000 miles away, in connection with which he said that he worked as much as 80 hours per week. At the end of 10 years, when defendant said that he wanted to slow down, if not retire, the properties were to be liquidated, the debts paid and the balance distributed to the parties equally.

Under defendants' theory, there would be no division of profits unless and until plaintiffs' time valued at $6, later $7, per hour ("sweat equity") equaled his dollar investment, at which time they would be entitled to 50 percent of the profits, that is, rents in excess of expenses. He did not say that plaintiffs' interest was to be measured by the proportion that their "sweat equity" bore to his monetary investment at any given time, although that appears to be his argument now.[8] Taken at face value, defendant's testimony is that plaintiffs would acquire a 50 percent interest in the profits, referring to rents, when, and only when, their "sweat equity"

---

[8] We doubt that defendant would agree that if, at the end of 10 years, plaintiffs' "sweat equity" exceeded his monetary investment they would be entitled to more than 50 percent of the net assets.

equaled his investment of money. He did not testify as to what the situation would be when the partnership was liquidated.

If defendant's testimony were to be accepted, plaintiffs would have no interest in the partnership unless and until their "sweat equity" equalled his money investment. If that were the case, there would have been no partnership on these facts until that event occurred, yet defendants concede that there was a partnership originally.

We disagree with defendants that plaintiffs' version of the agreement, as found by the trial court, does not make sense or that it is unfair. Defendant got what he bargained for: local management and servicing of the numerous properties, leaving him free to engage in his business 1,000 miles away.

An oral partnership may be proven by a preponderance of the evidence. *Bernard v. Vatheuer*, 303 Or 410, 416, 737 P2d 128 (1978). The question is whether the parties intended to establish such a relationship. *Hayes v. Killinger*, 235 Or 465, 471, 385 P2d 747 (1963). The trial court heard and observed the witnesses. It expressly referred to their credibility and found that plaintiffs sustained their burden to prove a partnership and the terms of the partnership. We agree with the trial court's findings. The cases on which defendants rely do not require a different result.

Affirmed.